No. 20-3273

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

RYAN T. McMULLEN,

Petitioner-Appellant,

v.

GARY DALTON and MELISSA STEPHENSON,

Respondents-Appellees.

---

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:19-cv-00356-JRS-MJD

---

### BRIEF OF PETITIONER-APPELLANT

---

Benjamin S. Morrell          TAFT STETTINIUS & HOLLISTER LLP
 *Counsel of Record*          111 E. Wacker Dr.
Michael A. Mayerck           Suite 2800
                             Chicago, IL 60601
                             (312) 527-4000
                             bmorrell@taftlaw.com
                             mmayerck@taftlaw.com

*Pro Bono Counsel for Petitioner-Appellant*

## Disclosure Statement

The undersigned counsel for Petitioner-Appellant Ryan McMullen makes the following submissions pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1:

(1) *Represented party's full name*. Ryan Tyrone McMullen.

(2) *Law firms that have appeared for the party*. Counsel, his co-counsel Michael A. Mayerck, and the law firm of Taft Stettinius & Hollister LLP represent McMullen pro bono in this appeal. McMullen proceeded pro se in the district court. The following attorneys and firms represented McMullen in cases in state court related to this appeal:

- Joe Keith Lewis of Lewis & Foust, LLP;

- Craig R. Persinger;

- C. Robert Rittman of the Grant County Public Defender's Office;

- Lisa M. Johnson of the Law Office of Lisa Malmer Johnson; and

- Stacy L. Kelley of Glaser & Ebbs.

(3) *Corporate entities*. N/A.

(4) *Organizational victims in criminal cases*. N/A.

(5) *Debtor information*. N/A.

By s/ *Benjamin S. Morrell*

Benjamin S. Morrell

TAFT STETTINIUS & HOLLISTER LLP

111 E. Wacker Dr.

Suite 2800

Chicago, IL 60601

Telephone: (312) 527-4000

Facsimile: (312) 527-4011

bmorrell@taftlaw.com

*Pro Bono Counsel for Petitioner-Appellant*

# Table of Contents

Page

Disclosure Statement.................................................................. ii

Table of Contents..................................................................... iv

Table of Authorities ................................................................ vii

Statement Regarding Oral Argument ........................................ xii

Statement Regarding Jurisdiction ............................................... 1

Questions Presented.................................................................... 3

Statement of the Case................................................................. 4

I.      McMullen's Trial and Sentencing in State Court ................... 4

        A.      Trial................................................................................ 4

        B.      Sentencing....................................................................... 5

                1.      The PSR.................................................................. 5

                2.      Counsel's investigation ......................................... 7

                3.      The sentencing hearing ......................................... 8

II.     Post-Sentencing Procedural History................................... 10

        A.      Direct appeal ................................................................ 10

        B.      Postconviction proceeding in state court ..................... 11

                1.      Evidence concerning McMullen's background ............... 11

                2.      Evidence concerning McMullen's mental health ........... 19

                3.      The trial court's decision ..................................... 21

                4.      The appellate court's decision............................. 22

        C.      Habeas petition in the district court........................... 24

        D.      Subsequent developments in state court ..................... 25

Standard of Review ......................................................................... 26

Summary of the Argument ............................................................ 27

Argument ......................................................................................... 29

I.    Deficient Performance ........................................................ 30

    A.    The state court's failure to address the deficient-performance prong of McMullen's *Strickland* claim subjects it to de novo review here. ............................................................. 30

B.    Trial counsel's performance at sentencing was constitutionally deficient. .......................................................................... 32

        1.    Failure to conduct a reasonable investigation into McMullen's background ................................. 33

        2.    Failure to have McMullen evaluated by a mental health professional or otherwise investigate his mental health ............................................................... 37

        3.    Failure to present sufficient evidence of mitigating circumstances at sentencing ............................... 38

II.    Prejudice ............................................................................... 39

    A.    Standard of review ................................................. 39

    B.    The mitigating evidence that counsel failed to discover and present was compelling. ........................................... 40

    C.    The state court unreasonably applied *Strickland* in finding counsel's performance did not prejudice McMullen at sentencing. ................................................................. 45

        1.    The state court's ruling that the unpresented mitigating evidence was cumulative is "objectively unreasonable." ....................................................... 45

        2.    The state court mischaracterized the nature and sources of much of the mitigating evidence. .......... 49

3.    The state court unreasonably dismissed mitigating evidence as not directly relating to the crimes of conviction. ................................................................................. 50

4.    The state court unreasonably failed to consider the mitigating evidence's effect on the aggravating circumstances. .......................................................................... 53

D.    The state court's finding of no prejudice was based on an unreasonable determination of the facts. ....................................... 57

Conclusion ............................................................................... 59

Certificate of Compliance .......................................................... 61

Certificate of Service ................................................................. 62

# Table of Authorities

**Cases**                                                            **Page(s)**

*Austin v. Bell*,
   126 F.3d 843 (6th Cir. 1997) ............................................................ 36, 37

*Barwick v. Sec'y, Fla. Dep't of Corr.*,
   794 F.3d 1239 (11th Cir. 2015) ............................................................ 52

*Bell v. Cone*,
   535 U.S. 685 (2002) ................................................................................ 44

*Boyde v. California*,
   494 U.S. 370 (1990) ................................................................................ 41

*Brewer v. Aiken*,
   935 F.2d 850 (7th Cir. 1991) ............................................................ 37, 38

*Bridges v. Beard*,
   941 F. Supp. 2d 584 (E.D. Pa. 2013) ................................................ 47, 48

*Brown v. Sternes*,
   304 F.3d 677 (7th Cir. 2002) .................................................................. 34

*Buck v. Davis*,
   137 S. Ct. 759 (2017) ............................................................................ xii

*Burns v. Mays*,
   31 F.4th 497 (6th Cir. 2022) .................................................................. 52

*Canaan v. McBride*,
   395 F.3d 376 (7th Cir. 2005) .................................................................. 31

*Carter v. Buesgen*,
   10 F.4th 715 (7th Cir. 2021) .................................................................... 1

*Carter v. Duncan*,
   819 F.3d 931 (7th Cir. 2016) ............................................................ 30, 31

*Cochran v. Buss*,
   381 F.3d 637 (7th Cir. 2004)1 .................................................................. 1

*Doe v. Ayers*,
   782 F.3d 425 (9th Cir. 2015) .................................................. 51

*Flint v. Carr*,
   10 F.4th 786 (7th Cir. 2021) .................................................. 31

*Gage v. Richardson*,
   978 F.3d 522 (7th Cir. 2020) .................................................. 30

*Goudy v. Basinger*,
   604 F.3d 394 (7th Cir. 2010) .................................................... 7

*Greene v. Fisher*,
   565 U.S. 34 (2011) ................................................................ 30

*Hamblin v. Mitchell*,
   354 F.3d 482 (6th Cir. 2003) .................................................. 44

*Hardwick v. Crosby*,
   320 F.3d 1127 (11th Cir. 2003) .............................................. 54

*Hurles v. Ryan*,
   752 F.3d 768 (9th Cir. 2014) .................................................. 51

*Jones v. Cunningham*,
   371 U.S. 236 (1963) ................................................................ 1

*Karis v. Calderon*,
   283 F.3d 1117 (9th Cir. 2002) ................................................ 39

*Kubat v. Thieret*,
   867 F.2d 351 (7th Cir. 1989) .................................................. 33

*Lafler v. Cooper*,
   566 U.S. 156 (2012) .......................................................... 29, 41

*Mayes v. Gibson*,
   210 F.3d 1284 (10th Cir. 2000) .............................................. 54

*McMullen v. State*,
   962 N.E.2d 643, 2011 WL 7491292 (Ind. 2011) ...................... 11

*McMullen v. State,*
110 N.E.3d 1147, 2018 WL 4212230 (Ind. 2018) .................................... 24

*McMullen v. State ("McMullen I"),*
950 N.E.2d 37, 2011 WL 2507057 (Ind. Ct. App. 2011) ................ 4, 10, 11

*McMullen v. State ("McMullen II"),*
102 N.E.3d 947, 2018 WL 3131420 (Ind. Ct. App. 2018) .................passim

*Miller v. Dretke,*
420 F.3d 356 (5th Cir. 2005) .............................................................44, 48

*Miller v. Martin,*
481 F.3d 468 (7th Cir. 2007) .................................................................. 39

*Porter v. McCollum,*
558 U.S. 30 (2009)..............................................................................passim

*Pruitt v. Neal,*
788 F.3d 248 (7th Cir. 2015) .................................................................. 26

*Reddy v. Kelly,*
657 F. App'x 531 (6th Cir. 2016) ........................................................... 44

*Reid v. State,*
876 N.E.2d 1114 (Ind. 2007) ................................................................. 44

*Rompilla v. Beard,*
545 U.S. 374 (2005) ...........................................................................passim

*Sawyer v. Whitley,*
505 U.S. 333 (1992) ................................................................................ 42

*Scheckel v. State,*
620 N.E.2d 681 (Ind. 1993).................................................................... 48

*In re Sealed Case,*
573 F.3d 844 (D.C. Cir. 2009)................................................................ 41

*Sears v. Upton,*
561 U.S. 945 (2010) ..........................................................................40, 54

*Smith v. Texas,*
    543 U.S. 37 (2004) ............................................................. 51

*Strickland v. Washington,*
    466 U.S. 668 (1984) ...................................................... passim

*United States v. Adams,*
    385 F. App'x 114 (3d Cir. 2010) ............................................ 55

*United States v. Best,*
    426 F.3d 937 (7th Cir. 2005) ................................................ 39

*Vinyard v. United States,*
    804 F.3d 1218 (7th Cir. 2015) .............................................. 29

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ...................................................... passim

*Williams v. Taylor,*
    529 U.S. 362 (2000) ...................................................... passim

## Statutes

28 U.S.C. § 1291 ....................................................................... 1

28 U.S.C. § 2241 ....................................................................... 1

28 U.S.C. § 2243 ..................................................................... 31

28 U.S.C. § 2253 ..................................................................... xii

28 U.S.C. § 2254 ................................................................ passim

Ind. Code Ann. § 35-38-1-7.1 ...................................... 10, 44, 52

Ind. Code Ann. § 35-48-4-6 ............................................... 4, 10

Ind. Code Ann. § 35-48-4-11 ................................................... 4

Ind. Code Ann. § 35-50-2-4 .................................................. 10

## Other Authorities

7th Cir. R. 34 ......................................................................... xii

APA Dictionary of Psychology.................................................... 19

Bryan A. Garner, *Garner's Modern English Usage* 57 (4th ed. 2016)................. 57

Fed. R. App. P. 34 ...................................................................... xii

Ind. R. App. P. 57........................................................................ 11

Ind. R. Post-Conviction Relief 1 ............................................... 11

## Statement Regarding Oral Argument

Petitioner McMullen requests oral argument. When the district court granted a certificate of appealability, it necessarily found that McMullen "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); (*see* Petitioner's Required Short Appendix ("RSA") at 23–24). The court also found that McMullen's claim of ineffective assistance of counsel at sentencing "deserves encouragement to proceed." (RSA at 24); *see Buck v. Davis*, 137 S. Ct. 759, 773 (2017). In light of these preliminary findings of merit, as well as the strong mitigation case developed at the state postconviction stage, Petitioner respectfully submits that the Court's decisional process would be significantly aided by oral argument in this case. *See* Fed. R. App. P. 34(a)(1); 7th Cir. R. 34(f).

## Statement Regarding Jurisdiction

*District court's jurisdiction.* The district court had jurisdiction over McMullen's habeas petition pursuant to 28 U.S.C. §§ 2254 and 2241. First, McMullen is "in custody pursuant to the judgment of a State court" and asserts "that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); (*see generally* District Court Record ("R.") 1). Second, the Wabash Valley Correctional Facility where McMullen was "in custody" at the time he filed his petition (and at the time the district court's judgment issued) is located in the Southern District of Indiana. *See* 28 U.S.C. § 2241(d).

As discussed *infra*, McMullen has been released from prison and is now in the custody of his probation officer (Respondent Dalton) and the head of the Grant County Probation Department (Respondent Stephenson). Because the terms of his probation impose "significant restraints on [his] liberty," *Jones v. Cunningham*, 371 U.S. 236, 242 (1963), McMullen remains "in custody" for purposes of § 2554(a), *see Cochran v. Buss*, 381 F.3d 637, 640 (7th Cir. 2004). (*See also* Docket Entry ("D.E.") 16-1 at 1–3.)

*Appellate jurisdiction.* This Court has jurisdiction over an appeal from a district court's final decision, 28 U.S.C. § 1291, including a denial of a habeas petition brought under § 2254, *see Carter v. Buesgen*, 10 F.4th 715, 720 (7th Cir. 2021).

The district court denied in full McMullen's § 2254 petition and disposed of all of his claims in its order. (RSA at 24.) A "final judgment" accompanied the order. (*Id.* at 26.) This Court therefore has jurisdiction over this appeal.

*Timeliness of appeal.* In his response to this Court's order directing former Respondent Vanihel to file a jurisdictional memorandum addressing the timeliness of McMullen's appeal, Respondent admitted that "McMullen filed his notice of appeal on time." (D.E. 11 at 1; *see* D.E. 10.) This issue is therefore not in dispute.

1.     The Sixth Amendment guarantees a criminal defendant's right to the effective assistance of counsel at sentencing. Prior to Petitioner McMullen's sentencing, his counsel conducted no investigation into his background (which would have revealed a "very significant history of childhood and adolescent trauma") or mental health (which would have revealed multiple clinical diagnoses, including PTSD). At the sentencing hearing, counsel presented no evidence and called no witnesses. Was counsel's performance constitutionally deficient?

2.     The trial court sentenced McMullen to fifty years in prison—the statutory maximum. The only evidence before the court regarding McMullen's background or mental health was passing references in the presentence report gleaned from an interview with McMullen himself. In finding there was no reasonable probability the trial court would have given McMullen any lower sentence had counsel presented mitigating evidence, did the Indiana Court of Appeals unreasonably apply Supreme Court precedent?

3.     In concluding McMullen suffered no prejudice as a result of his counsel's performance at sentencing, the Indiana Court of Appeals found that "because of the presentence investigation report, the sentencing court was already well aware of McMullen's background and any mental health concerns." But the PSR contained no evidence of McMullen's mental health diagnoses and scant mention of his background. Was the appellate court's decision based on an unreasonable determination of the facts?

## Statement of the Case

### I. McMullen's Trial and Sentencing in State Court

#### A. Trial

In January 2009, McMullen was arrested and charged with drug-related offenses after a maintenance worker found a weapon in the apartment where McMullen was staying and called the police. *See McMullen v. State ("McMullen I")*, 950 N.E.2d 37, 2011 WL 2507057, at *1–2 (Ind. Ct. App. 2011) (table); (Petitioner's Long Appendix ("LA") at 64–70). A search of the apartment led to the discovery of, among other things, cocaine and marijuana. *McMullen I*, 2011 WL 2507057, at *1.[1] Following a trial in the Circuit Court of Grant County, Indiana, McMullen was convicted of Possession of Cocaine (a Class A felony) and Possession of Marijuana (a Class D felony), in violation of Ind. Code Ann. §§ 35-48-4-6(b)(3)(B)(iii) (2009) and 35-48-4-11(1) (2009), respectively.[2] (LA at 58, 60, 67.) Attorney Joe Keith Lewis of Marion, Indiana represented McMullen at trial. (*Id.* at 62.)

---

[1] The Indiana Court of Appeals' decision on direct review discusses in detail the facts surrounding McMullen's trial. *See id.* at *1–3. McMullen does not do so here because this appeal challenges only his sentence, not his underlying convictions.

[2] The jury also found McMullen guilty of a lesser included charge of Possession of Cocaine (a Class C felony), but the trial court vacated that conviction "[d]ue to double jeopardy considerations." (LA at 53, *see id.* at 59, 68–69.)

## B. Sentencing

### 1. The PSR

A probation officer conducted a presentence investigation, which included an interview with McMullen and a review of records and reports from several Grant County law enforcement agencies, and prepared a report ("PSR"). (R. 8 at 3.)[3] The PSR listed the dates, charges, and dispositions of McMullen's "prior legal history" beginning as a juvenile at age ten. (*Id.* at 3–7.) It also listed several programs McMullen had been placed in as a juvenile and as an adult. (*Id.* at 7.)

The only evidence in the PSR of McMullen's family and social background came from his own statements. (*See id.* at 3.) The PSR's "Family/Personal Background" section included the following:

> The Defendant stated he was raised by, his mother until age seven (7) when he was placed with his grandmother. The Defendant stated he moved back with his mother at age twelve (12) but it didn't work out. The Defendant stated he move [sic] back with his grandmother at age fifteen (15) or sixteen (16). The Defendant stated his childhood was "not great". The Defendant stated he lives with his father at his grandmother's home and that their relationship is casual. The Defendant stated his father was not a father figure in his life. The Defendant described his relationship with his mother as "I am trying to like my mother and she is trying to change her life." "I am trying not to hold a grudge or to blame her for my childhood." The Defendant stated both of his parents have criminal records.

---

[3] Because the PSR was filed under seal in the district court, it is not included in either appendix and does not have CM/ECF pagination. *See* 7th Cir. R. 10(f). Citations to it here use the document's internal pagination (rather than the stamped pagination that appears to be from the appendix to McMullen's direct appeal).

(*Id.* at 9.) Additionally, in a section discussing McMullen's reason for going to trial rather than taking a plea deal, the PSR quoted McMullen as follows:

> "When I was twelve (12) years old I called a [narcotics] detective and told him about my mother's boyfriend and how he was selling cocaine and getting my mother addicted to it." "He said there was nothing he could do about it, I later learned that he was using the boyfriend as an informant." "He was later arrested for dealing and got a plea bargain like I would like to have." "He abused my mother, dealt drugs and abused me and my sister, you gave him another chance and a plea bargain like I want."

(*Id.* at 18.)

The only evidence in the PSR regarding McMullen's mental health also from his own statements. (*See id.* at 8.) The relevant section provided:

> The Defendant stated his mental health is "oaky" [sic]. The Defendant stated he has never been diagnosed with a mental health disorder but has had some concerns about depression. The Defendant stated he is not taking any medication for a mental health disorder. The Defendant stated he was involved with counseling as a juvenile when held at YOC and in other programs. The Defendant stated he was also in counseling at Family Services Society when he was removed from his mother's care due to abuse.

(*Id.* at 13.) Elsewhere, the PSR provided that "Defendant stated he has an anger control issue." (*Id.* at 12.) In the "Substance Abuse" subsection, McMullen recounted his issues with alcohol. (*Id.* at 11.)

The PSR contained no findings from a medical professional, nor did it indicate that any examination had been conducted by one. Instead, it discussed

results of "self report assessment instrument[s]." (*Id.* at 12.) The "Criminal Thinking Scale" purported to "measure criminal thinking traits as compared with a national nonnative sample," and gave McMullen an "elevated score" regarding "Power Orientation."[4] (*Id.*) The "Substance Abuse Subtle Screening Inventory"—"a self-report tool that measures various elements of alcohol/drug dependency"—determined McMullen had a "'high probability' of having substance dependence." (*Id.*) The "Level of Services Inventory-Revised" assessment tool gave McMullen a "***very high*** range for risk of reoffending." (*Id.*) It listed the results of the above-discussed tests among other purported evidence supporting this conclusion. The PSR recommended a forty-five year sentence for the Possession of Cocaine conviction. (*Id.* at 14.)

### 2. Counsel's investigation

Attorney Joe Keith Lewis represented McMullen at sentencing. (LA at 72.) Counsel's investigation prior to sentencing was practically nonexistent. In his own words, he "really didn't do anything independently to develop any mitigation for sentencing. [He] just relied upon the presentence investigation report." (*Id.* at 251.) This is despite that counsel "was well aware of [McMullen's]

---

[4] Over this paragraph in the PSR appear the handwritten words: "also abused and/or neglected." (R. 8 at 12.) But it is unknown when or by whom these words were written.

difficult upbringing" from speaking with McMullen's grandmother. (*Id.*) Lewis did not speak with any of McMullen's friends or other family members. (*Id.*) He did not even visit McMullen in jail during the month between the conviction and the sentencing hearing. (LA at 231–36.) And counsel knew the importance of mitigation evidence at sentencing. He explained at the hearing on McMullen's postconviction petition:

> I'm on the public defender board and I'm capital trained so I well know the advantage of mitigation testimony. I also know that it requires effort really from the first day you take the case to develop in any kind of persuasive way. I didn't ask for additional money to do that so I didn't consider doing that. That probably should have been asked for and should have been done. Without that information I really didn't have an opportunity to do that. In this particular case he still had a pending attempted murder charge and three other drug charges and I didn't think that mitigation would stack up, but I'm aware that it's valuable and I have used it in other cases and tried to use it in other cases, but I did not in this case.

(*Id.* at 251–52.) Lewis "didn't consider" having McMullen evaluated by a mental health professional prior to sentencing, and did not do so. (*Id.* at 252.)

### 3. The sentencing hearing

The trial court held a sentencing hearing in September 2010. (LA at 71.) McMullen's counsel did not call any witnesses or present any evidence. (*Id.* at 75.) Neither did the prosecutor. (*Id.*) Instead, they presented argument to the court concerning the PSR. The prosecutor discussed at length McMullen's previous run-ins with law enforcement and argued his "previous criminal history"

8

was the "heaviest" aggravating circumstance. (*Id.*) He continued: "it's the State's belief that this defendant has been a menace to this community since the age of ten years old. He has no social redeeming factors." (*Id.* at 76.) The prosecutor requested the statutory maximum sentence of fifty years. (*Id.*)

In response, Lewis noted that most of the offenses in McMullen's record were minor and many were eventually dismissed. (*Id.* at 77.) His discussion of McMullen's background and mental health was limited to the following:

> Uh, I noticed that, uh,...that...you know...he's regarded as having a criminal thinking skill because of need of power and control. That's under 'Power Orientation', noted on page twelve. Uh, I would also observe that those factors also exist in a person who's been abused and/or neglected and there is reference regarding a boyfriend who abused him, abused his mother, abused his sister. Uh, I think that, uh, those individuals that have issues of control in their lives are people who have been abused and/or neglected. And so, that need can also be looked at as a mitigator. And quite often is looked at as a mitigator in capital cases. Uh, the history which explains the behavior. Uh, it's different then excepting [sic] the responsibility for your actions. It's a matter of understanding it objectively.

(*Id.* at 78–79.) Counsel did not mention any positive characteristics, e.g., that McMullen was a caring and loving father to his children. (*See* LA at 180.)

The trial court sentenced McMullen from the bench and later issued an order. The court recognized two aggravating circumstances:

1.   The Defendant has a lengthy history of criminal or delinquent behavior, despite being only 24 years of age, which history includes numerous failures to abide by the terms and conditions of probation.

2. The defendant had been released from jail, and applying for home detention and was given a report date for incarceration, after which he failed to report to jail as directed to serve his sentence. These offenses were committed while he was a fugitive from this Court's warrant.

(*Id.* at 53–55; *see id.* at 80–82.) Meanwhile, as the Indiana Court of Appeals noted on direct review, "[t]he trial court recognized the undue hardship that McMullen's incarceration would have on his dependents as the sole mitigating circumstance." *McMullen I*, 2011 WL 2507057, at *3; (*see* LA at 54); *see also* Ind. Code Ann. § 35-38-1-7.1(b)(10) (2008). The court refused to "accept the other mitigating factors that have been [presented] by counsel," (LA at 82), and found "the aggravating circumstances substantially outweigh the mitigating circumstances, justifying the imposition of an enhanced sentence," (*Id.* at 54). It made no mention of McMullen's background or mental health.

The trial court sentenced McMullen to fifty years of incarceration for the cocaine possession conviction—the statutory maximum—and three years for the marijuana possession conviction, to be served concurrently. (*Id.* at 55, 82); *see* Ind. Code Ann. §§ 35-48-4-6(b)(3)(B)(iii) (2009), 35-50-2-4 (2009).

## II. Post-Sentencing Procedural History

### A. Direct appeal

McMullen appealed to the Indiana Court of Appeals challenging, among other things, his sentence. (LA at 50.) The court affirmed his convictions and—

faced with the same record of his background and mental health as the trial court—his sentence. *McMullen I*, 2011 WL 2507057, at *6. A divided Indiana Supreme Court denied McMullen's petition to transfer. *McMullen v. State*, 962 N.E.2d 643, 2011 WL 7491292 (Ind. 2011) (table); *see* Ind. R. App. P. 57(A).

## B.    Postconviction proceeding in state court

McMullen filed a petition for postconviction relief in the state trial court (before the same judge who sentenced him), raising several claims of ineffective assistance of counsel. (R. 7-8 at 17, 35–45, 99–109); *see* Ind. R. Post-Conviction Relief 1. As relevant here, McMullen argued that he received ineffective assistance at sentencing when Attorney Lewis "failed to conduct a reasonable investigation of McMullen's character, background, and mental status, arrange for him to be evaluated by a mental health professional, and present evidence of mitigating circumstances at the sentencing hearing" (the "sentencing claim"). (R. 7-8 at 17, 41.) Postconviction counsel presented many exhibits containing mitigating evidence available to Lewis at the time of McMullen's sentencing. (*Id.* at 47–49; *see* LA at 110–11.)

### 1.    Evidence concerning McMullen's background

McMullen submitted twenty-one affidavits in support of his postconviction petition (LA at 113–41, 170–83, 215–30.) Those discussed below are relevant to his sentencing claim:

*Anna Parcher*. (*Id.* at 113–17.) Anna is Ryan McMullen's paternal grandmother. She testified that Ryan's mother, Carolyn McMullen, was addicted to crack cocaine for many years. Ryan's father, Rodney Fouce, verbally and physically abused Carolyn and was not actively involved in Ryan's life. Carolyn had several boyfriends during Ryan's childhood. One, Derrick Morgan, physically abused Carolyn in front of Ryan. Another, Ronnie Persaud, physically and verbally abused Carolyn, Ryan, and Ryan's sister, Sharmaine Morgan. Ronnie was a drug dealer and kept Carolyn supplied with crack cocaine. When Ryan visited Anna, he often had bruises or scratches. Ronnie eventually indoctrinated Ryan into the life of selling drugs. Ryan lived with Anna or Carolyn off and on throughout his childhood. When he lived with Carolyn, he was constantly exposed to physical abuse and drug use. Anna was contacted by attorney Lewis but was not called to testify at sentencing.

*Carolyn McMullen*. (*Id.* at 118–21.) Carolyn is Ryan's mother. She testified that she was "addicted to drugs from the time [Ryan] was born." In her own words: "I was not there for Ryan when he was growing up. My children should have been my number one priority, but I let drugs and abusive boyfriends rule my life. I did not care about anything except drugs." Carolyn stated that Derrick and Ronnie physically abused her in front of Ryan. Carolyn was never contacted by Attorney Lewis.

*Rochelle Fouce*. (*Id.* at 112–24.) Rochelle is Ryan's paternal aunt. She testified that Ryan's home life with Carolyn versus Anna was "night and day" due to Carolyn's drug addiction and Ronnie's abuse. Rochelle was never contacted by Attorney Lewis.

*Monique Davis*. (*Id.* at 125–26.) Monique is Ryan's childhood friend. She testified that Ryan is a "caring person who is sincerely concerned about other people," and, growing up, Ryan's family life was "very unstable" and that he suffered from a "lack of nurturing and guidance." Monique was not called to testify at Ryan's sentencing hearing.

*Sam Cannon* (*Id.* at 127–29.) Sam is Ryan's maternal cousin. He testified that Ryan was separated from his sister, Sharmaine, at an early age. Sam provided that Ryan was "very protective" over Sharmaine and was "devastated about being separated from his baby sister." Sam was never contacted by Attorney Lewis.

*Mariann Pearcy*. (*Id.* at 130–32.) Mariann is a licensed Marriage and Family Therapist. Ryan visited her for counseling as a child. She testified that Carolyn was "in and out" of Ryan's life due to her drug addiction and Ryan was "very protective over his mother and sister." Mariann was never contacted by Attorney Lewis.

*Sharmaine Morgan*. (*Id.* at 133–35.) Sharmaine is Ryan's half-sister. She

testified that Carolyn had multiple abusive boyfriends during her childhood. She singled out Ronnie as "the worst" because he "got our mom to use drugs, and he abused [Sharmaine], Ryan, and [Carolyn]." She recalled that Ronnie would hit Carolyn in front of her and Ryan, and would blindfold Sharmaine, smother her, then stop right before she passed out, while making Ryan watch. Sharmaine often had bruises from Ronnie hitting her. Sharmaine was never contacted by Attorney Lewis.

*Jasmine Davis*. (*Id.* at 136–38.) Jasmine and Ryan have two children together. Jasmine testified that she knew Ryan since childhood and that Carolyn was an addict who "essentially abandoned [Ryan] for her boyfriend." She recounted an instance where Carolyn attempted to buy drugs from Ryan's friend in front of him. Jasmine also testified that, before being incarcerated, "Ryan [had] always been a good father to our children and his other children." He "spent a lot of time with his kids," and "[e]ven though there was no child support order, he always provided financially for his children." Jasmine testified at trial but was not called during the sentencing hearing.

*Darlene Kee Casper*. (*Id.* at 139–41.) Darlene is Ryan's maternal aunt. She testified about Carolyn's long history of drug addiction and that Ryan's father, Rodney, had anger problems and was eventually admitted to a mental health facility. Darlene recalled that Ryan and Sharmaine often had bruises as children

14

and, in one instance, Ronnie threw Sharmaine down the stairs. Darlene was never contacted by Attorney Lewis.

*Daphne Royal.* (*Id.* at 170–72.) Daphne is Sharmaine's paternal grandmother. Daphne testified that she noticed bruises on Ryan and Sharmaine after Carolyn started seeing Ronnie, and Ryan told her Ronnie was abusing Ryan and Sharmaine, that he tied the children up and put them in a closet, and that he beat Carolyn in front of them on a regular basis. Daphne was never contacted by Attorney Lewis.

*Rick Fouce.* (*Id.* at 173–75.) Rick is Ryan's paternal great-uncle. He testified about Ronnie's abuse of Ryan, Sharmaine, and Carolyn, and that Ronnie got Ryan to begin selling drugs in high school. Although Carolyn knew about Ronnie's encouragement, "she did not intervene." Rick was never contacted by Attorney Lewis.

*Trenton Parcher.* (*Id.* at 176–78.) Trenton is Ryan's paternal uncle. He testified that Carolyn had a drug problem for most of Ryan's life and Ryan's father, Rodney, also had issues with drugs and alcohol and "was not able to give Ryan any positive support or guidance." Trenton was never contacted by Attorney Lewis.

*Ashlee Kemp.* (*Id.* at 179–80.) Ashlee and Ryan have one child together. From growing up in the same town as Ryan, Ashlee knew Carolyn had a drug

problem and did not provide much nurturing or guidance during Ryan's childhood. She testified that Ryan "has tried to do a better job of parenting his children than his parents did with him":

> Ryan has always been an attentive and loving father. He always wanted to be with his children and spend a lot of time with them. He provided for them financially, took them on outings, and played with them. Even now that he is in prison, he keeps in touch with our son by telephone and encourages him to work hard in school and do the right thing.

Ashlee was never contacted by Attorney Lewis.

*Sammy McMullen.* (*Id.* at 181–83.) Sammy is Ryan's maternal uncle. He recounted the differences between Ryan's home life living with Carolyn versus Anna as explained by other family members above. In his opinion, "90% of Ryan's problems [were] the result of the chaos he experienced when he lived with his mom and her boyfriends." Sammy was never contacted by Attorney Lewis.

*Janita Glasser.* (*Id.* at 215–18.) Janita and Ryan have three children together. Janita testified that Ryan was a present father before being incarcerated. He "provided for the boys financially, and he was actively involved in their daily lives." Janita recounted the abuse Ryan and Sharmaine experienced as children and stated that Ryan "witnessed Sharmaine being sexually abused by his mother's boyfriend several times." Janita also explained that Ryan was very close to his cousin, Lamar Cannon, who was shot and killed in 2007. Ryan was

with Lamar before he was shot and was with him at the hospital when he died. Ryan "took Lamar's death very hard." Janita testified at Ryan's trial but was not called to testify at his sentencing hearing.

*Barry McMullen.* (*Id.* at 228–30.) Barry is Ryan's maternal uncle. He testified that Carolyn and Ronnie sold drugs out of their home when Ryan was a child and he and his father "chased Ronnie out of the house because of his violence against Carolyn" on several occasions. Barry explained that he was currently serving time for selling cocaine, and, as a child, Ryan especially looked up to him and was "surrounded by family members, who sold drugs, to earn a living." Barry was not called to testify at Ryan's sentencing hearing.

*Ryan McMullen.* Ryan provided additional details about his upbringing. (*Id.* at 219–27.) He testified that his mother Carolyn was addicted to crack cocaine as far back as he can remember and growing up, family members called him a "crack baby." (*Id.* at 220.) During his childhood, he watched his mother slowly deteriorate from chronic drug abuse. (*Id.* at 222.)

Ryan had been repeatedly told that his father Rodney never wanted him as a son and assaulted Carolyn multiple times while she was pregnant with him to attempt to induce a miscarriage. (*Id.* at 220.) Ryan did not get to know Rodney until he was seven and recalled Rodney stealing from his grandmother and from his school fundraisers to support an addiction to drugs and alcohol. (*Id.* at 221.)

Ryan lived in "crack houses" during his childhood. (*Id.* at 222.) Police raids were common. (*Id.*) When he was around five years old, police threw smoke bombs through the window, broke the door down with a battering ram, entered the house, guns drawn, and threw Carolyn and other adults to the floor. (*Id.*) Ryan developed a crushing fear of law enforcement and would "cry and try to hide" when he saw a police officer. (*Id.*) Ryan developed a severe stutter from an early age, which led to bullying. (*Id.* at 221.) He began having suicidal thoughts at age seven. (*Id.* at 223.) He also suffered "excruciating" migraines from an early age, which, according to his doctor, were caused by stress. (*Id.* at 222–23.)

Ryan witnessed his mother "being beaten, burned with irons, smacked, punched, and kicked" by her boyfriends. (*Id.* at 221.) Before Ryan turned seven, Carolyn's boyfriend put a gun to her head in front of Ryan and Sharmaine and asked them why he should not kill her. (*Id.*) When Ryan would put himself between Ronnie and Carolyn or Sharmaine, Ronnie would "smack and punch" him. (*Id.*) Ryan attempted to turn Ronnie in to the police but was unsuccessful. (*Id.*) At fourteen, Ryan began helping Ronnie sell drugs, hoping to make Ronnie less physically abusive. (*Id.* at 223.) Later, he began selling drugs himself, attempting to break his family's financial dependence on Ronnie. (*Id.*)

## 2. Evidence concerning McMullen's mental health

McMullen's postconviction petition also included evidence related to his mental health.

*YOC report.* At thirteen, McMullen's juvenile probation officer referred him to the Youth Opportunity Center ("YOC"), a licensed psychiatric residential treatment facility in Muncie, Indiana, for a full battery of psychological testing. (LA at 189; *see id.* at 206.) The resulting report noted McMullen's responses "suggest that he has lost hope and rarely experiences pleasure," "suggest a lack of interpersonal warmth in the home, and indicated a "high, persistent level of anxiety." (*Id.* at 196.) "Educational testing" revealed McMullen's "low average cognitive ability with commensurate achievement scores," while "[d]iagnostic testing suggested clinically significant concerns with social isolation, anxiety, and conduct." (*Id.*) McMullen was diagnosed with severe, childhood onset "conduct disorder" and early onset "dysthymic disorder."[5] (*Id.*) The YOC report made several recommendations for treatment, including "place[ment] in a nurturing and structured residential program which will address [McMullen's] behavioral and psychological needs," individual counseling, family therapy, and

---

[5] This is "a mood disorder characterized by symptoms that are less severe but more enduring than those in major depressive disorder. It is identified as persistent depressive disorder in DSM–5." "Dysthymic disorder," *APA Dictionary of Psychology*, https://dictionary.apa.org/dysthymic-disorder.

parenting classes for his mother (*Id.* at 197.) Attorney Lewis did not offer the YOC report into evidence at McMullen's sentencing hearing.

*Kohli report.* McMullen also submitted the report of Dr. Robin Kohli, a clinical psychologist who examined him in 2016 in connection with his postconviction petition. (LA at 151; *see id.* at 143.) Dr. Kohli conducted "a psychological evaluation to assess Ryan's history of trauma and evaluate him for other mental health concerns, which may have played a role in his current and past criminal offenses." (*Id.* at 152.) She engaged in a comprehensive review of documents related to McMullen's case, conducted an extensive interview with McMullen, and performed several psychological tests. (*Id.*)

Dr. Kohli concluded that McMullen experienced a "very significant history of childhood and adolescent trauma, which included physical abuse, neglect, and witnessing horrific domestic violence." (*Id.* at 78.) He "experienced significant emotional abuse and neglect by his paternal grandmother and his extended family" and "significant bullying and rejection at school, where his peers ruthlessly teased him about his severe stutter" and "for having parents who were drug addicts." (*Id.* at 166.) Regarding moral development, Dr. Kohli found that McMullen "was raised in a violent family where he was raised to fear the police and to believe that drugs and violence were a normal part of growing up." (*Id.*)

Nevertheless, he "did not present with the narcissistic, criminalized thinking patterns common for incarcerated offenders." (*Id.* at 80.)

Dr. Kohli diagnosed McMullen with panic disorder, posttraumatic stress disorder ("PTSD"), substance abuse disorder, and antisocial personality disorder. (*Id.* at 168.) Attorney Lewis did not offer evidence concerning any diagnosis of McMullen at his sentencing hearing.

### 3. The trial court's decision

Following an evidentiary hearing at which Attorney Lewis and McMullen both testified, the court denied McMullen's petition for postconviction relief (and a contemporaneously filed motion to modify his sentence). (LA at 109; *see id.* at 237–300.) The court described McMullen's sentencing claim as "alleg[ing] that Lewis should have presented additional evidence at sentencing regarding the mitigating factor of McMullen's troubled childhood." (*Id.* at 102.) It did not acknowledge McMullen's mental health evidence. (*Cf.* R. 7-8 at 101, 107–08.)

The court stressed "that Lewis, in fact, did assert that McMullen's troubled childhood was a mitigating factor at sentencing" and characterized his new evidence as simply "testimony of friends and family members at sentencing indicating that they like the criminal defendant and offering their opinion of where and why such person went off the tracks of lawful behavior." (LA at 102.) The court held that this "testimony, to the extent that it had any value at all, would

have been cumulative of facts already established by the Presentence Investigation Report and arguments already offered by Lewis." (*Id.* at 102–103.) It also found "McMullen fails to establish how that troubled childhood excuses his decision to engage in the illegal business of drug dealing." (*Id.* at 103.)

The court then listed the opportunities McMullen had "to rehabilitate his behavior" and stated: "throughout the course of his criminal history, he had demonstrated no interest in changing his criminal behavior. None of the evidence which McMullen argues should have been offered at sentencing would change or obscure those stark facts." (*Id.*) After quoting *McMullen I*'s summary of his prior charges, arrests, convictions, and other violations, the court concluded: "what was outcome-determinative at sentencing was not the quality of the argument that his attorney made on the day of sentencing, but rather McMullen's increasingly troubling behavior and history which occurred in the thirteen years prior." (*Id.*)

### 4.    The appellate court's decision

McMullen appealed to the Indiana Court of Appeals. (R. 7-8 at 2; *see* R. 6-10.) Regarding his sentencing claim, the court "initially note[d] that Lewis did argue several mitigating circumstances at McMullen's sentencing hearing," but made no determination as to whether counsel's performance was constitutionally deficient. *McMullen v. State ("McMullen II")*, 102 N.E.3d 947, 2018 WL

3131420, at *11 (Ind. Ct. App. 2018) (table). It also stated "because of the presentence investigation report, the sentencing court was already well aware of McMullen's background and any mental health concerns." *Id.*

Like the trial court, the appellate court quoted *McMullen I*'s summary of McMullen's prior legal history; it then quoted portions of the trial court's order listing McMullen's "opportunities prior to the incidents in question to rehabilitate his behavior" and concluding that "McMullen's increasingly troubling behavior and history" were to blame for his maximum sentence rather than his lawyer. *Id.* (record citation omitted). The court continued:

> We agree. The additional mitigating evidence that McMullen argues could have been offered by his friends and family, *see* Appellant's Br. at 51–52, would not have favorably impacted his sentence. Moreover, that same evidence would have done nothing to account for or explain the illegal possession of marijuana and cocaine for which McMullen was convicted. *Cf. McCarty v. State*, 802 N.E.2d 959, 963–969 (Ind. Ct. App. 2004) (holding that trial counsel was ineffective where defendant was convicted of child molestation and prior to sentencing counsel failed to investigate defendant's mental disability, defendant's molestation as a teenager, and that defendant would respond well to treatment), *trans. denied*.
>
> For these reasons, we find that there is no reasonable probability that McMullen would have received a different sentence if Lewis would have argued more or different mitigating circumstances at sentencing. *See Johnson v. State*, 832 N.E.2d 985, 1005 (Ind. Ct. App. 2005), *trans. denied*; *McCarty*, 802 N.E.2d at 967 (explaining that "[t]he dispositive question in determining whether a defendant is prejudiced by counsel's failure at sentencing to present mitigating evidence is what effect the totality of the omitted mitigation evidence would have had on the sentence."). Accordingly, McMullen has failed to demonstrate that he received ineffective assistance of

counsel at sentencing.

*Id.* at *11–12.

The court affirmed the denial of McMullen's postconviction petition. *Id.* at *14. McMullen sought further review in the Indiana Supreme Court, but it denied his petition to transfer. *McMullen v. State*, 110 N.E.3d 1147, 2018 WL 4212230 (Ind. 2018) (table); (*see* R. 6-14).

### C. Habeas petition in the district court

McMullen filed a habeas petition under 28 U.S.C. § 2254 in federal court in the district where he was incarcerated, raising three claims of ineffective assistance, including his sentencing claim. (R. 1; R. 11 at 56.) The district court reviewed the first prong of this claim de novo after finding the Indiana Court of Appeals failed to address it. (RSA at 16.) The court held Attorney Lewis's performance was constitutionally deficient because he failed to conduct any investigation into mitigating circumstances despite "red flags" in the PSR that should have spurred him to do so and knowing the importance of such evidence. (*Id.* at 18.) "As a result, the sentencing court did not have before it a comprehensive view of Mr. McMullen's traumatic childhood and related mental health issues, nor did it have evidence of his positive characteristics to combat the State's portrayal of him as a 'menace' with 'no social redeeming factors.'" (*Id.* at 19 (record

citation omitted).)

As for prejudice, the district court stated: "Although the Indiana Court of Appeals identified the correct standard, it is not clear that it reasonably applied the standard to the facts" because of its statement that the PSR made the sentencing court "well aware of McMullen's background and any mental health concerns." (*Id.* at 20 (citation omitted).) The district court found that examining the PSR showed "the sentencing court was *not* aware of the severe nature of Mr. McMullen's childhood trauma or the impact it had on his mental health and behavior." (*Id.*) But it stopped just short of granting the writ, and concluded the state court's decision was not an unreasonable application of federal law. (*Id.* at 21.)

The district court denied McMullen's habeas petition but granted a certificate of appealability as to his sentencing claim. (RSA at 23–26.) This appeal followed. (R. 14.)

### D.  Subsequent developments in state court

In November 2020, McMullen, through counsel, filed a renewed motion for modification of his sentence in the Superior Court of Grant County. (D.E. 16-2.) In April 2021, the court granted it, suspended the remainder of McMullen's fifty-year sentence, placed McMullen on probation, and ordered his release from the Indiana Department of Correction to Grant County's Community

Transition Program. (D.E. 16-3.) McMullen's probation began in May 2021, to continue until September 2049. (D.E. 16-4 at 2; *see* D.E. 16-6.)

In the months that followed, McMullen completed the Community Transition Program's home detention period and graduated from Grant County Reentry Court—making him eligible for a 33.33% reduction of his remaining probation term. (D.E. 16-5; D.E. 16-6.) On May 6, 2022, the state court entered an order granting that reduction. (D.E. 16-6.) McMullen's term of probation will now end in July 2040. (*Id.*)

While McMullen is no longer physically incarcerated, the terms of his probation make clear that "the Court may at any time revoke, modify or extend [his] probation," and they impose numerous obligations and restrictions on him. (D.E. 16-4.) For example, McMullen is prohibited from consuming alcohol, visiting any jails or prisons, and leaving the state without court permission, and he must periodically report to his probation officer, Respondent Dalton, consent to searches, seizures, and visits from Dalton at any time, and submit to drug testing. (*Id.* at 2–3.)

## Standard of Review

This Court reviews de novo the district court's denial of McMullen's § 2254 petition. *Pruitt v. Neal*, 788 F.3d 248, 264 (7th Cir. 2015). Standards gov-

erning the Court's review of McMullen's claim for ineffective assistance of counsel and the relevant state-court decision are discussed *infra*.

## Summary of the Argument

The district court correctly found McMullen's counsel performed deficiently at sentencing. This prong is reviewed de novo because the Indiana Court of Appeals did not decide whether Attorney Lewis's performance was deficient. First, counsel failed to investigate McMullen's background, which would have revealed detailed evidence of significant childhood trauma, including violent physical abuse and extreme neglect by his drug and alcohol addicted parents and his mother's series of violent boyfriends. Second, counsel failed to have McMullen evaluated by a mental health professional or otherwise investigate McMullen's mental health. This would have revealed diagnoses of several mental health disorders, including PTSD. Red flags in the PSR, conversations with McMullen's grandmother, and prior training should have spurred Lewis to reach beyond the PSR for mitigating evidence. Third, counsel failed to present any evidence or call any witnesses at the sentencing hearing. Counsel's inaction was not the result of reasoned, strategic decisionmaking but rather an "abdication of advocacy."

The Indiana Court of Appeals unreasonably applied federal law when it

found McMullen suffered no prejudice from Lewis's representation at sentencing. The evidence of McMullen's background and mental health disorders is of the sort recognized by the Supreme Court as having a powerful mitigating effect. The appellate court's conclusion that there was no reasonable probability the trial court would have imposed any sentence lower than the statutory maximum had Lewis presented this evidence is objectively unreasonable. Four errors stand out.

First, the court incorrectly stated that the unpresented evidence was already contained in the PSR and thus cumulative. The PSR contained practically no evidence regarding McMullen's mental health and its vague, cursory references to abuse cannot be fairly equated with the graphic, detailed, and corroborated descriptions of McMullen's horrific childhood developed at the postconviction stage. Second, the court mischaracterized the mitigating evidence as only coming from McMullen's friends and family, failing to mention or acknowledge the psychological evaluations that contained the strongest mitigating evidence.

Third, the court unreasonably dismissed the mitigating evidence as failing to account for or explain the offenses of conviction. Here the court failed to consider how the ubiquitous cocaine use, addiction, and dealing McMullen was exposed to during his childhood would have explained him dealing that same drug as an adult. Also, the Supreme Court has held that mitigating evidence need not

directly relate to the offense to be relevant at sentencing. Fourth, the court failed to reweigh the totality of the mitigation evidence against the aggravating circumstances, and instead relied on prior state-court decisions in this case that did not fairly address it. To the extent the court did weigh this evidence, it unreasonably gave too little weight to the mitigating evidence it mischaracterized.

The first three errors also show the state court's decision was based on an unreasonable determination of the facts, as clear and convincing evidence in the record demonstrates the court's mischaracterizations of the facts.

Unconstrained by AEDPA deference, the Court should find there was a reasonable probability the trial court would have given McMullen any sentence lower than the fifty-year statutory maximum had Lewis discovered and presented the evidence of McMullen's history of childhood abuse and neglect and his mental health disorders. The Court should therefore reverse.

## Argument

"The Sixth Amendment to the United States Constitution guarantees the accused in a criminal case the right to the effective assistance of counsel." *Vinyard v. United States*, 804 F.3d 1218, 1224 (7th Cir. 2015). That right extends to sentencing in noncapital cases. *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). *Strickland v. Washington* provides the framework for analyzing McMullen's Sixth Amendment claim. 466 U.S. 668 (1984). "Under *Strickland*'s familiar two-prong

test, we begin with the issue of deficiency, i.e., whether 'counsel's representation fell below an objective standard of reasonableness,' and then consider the issue of prejudice, i.e., whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Carter v. Duncan*, 819 F.3d 931, 941 (7th Cir. 2016) (citations omitted). McMullen must satisfy both prongs. *Gage v. Richardson*, 978 F.3d 522, 527 (7th Cir. 2020).

## I.   Deficient Performance

### A.   The state court's failure to address the deficient-performance prong of McMullen's *Strickland* claim subjects it to de novo review here.

A federal court's collateral review of a state-court conviction focuses on the "last state-court adjudication on the merits of" the petitioner's claims. *Greene v. Fisher*, 565 U.S. 34, 40 (2011). If the state court adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act ("AEDPA") restricts habeas relief to only cases in which the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2).

But "[w]hen a state court is silent with respect to a habeas corpus petitioner's claim, that claim has not been 'adjudicated on the merits' for purposes of § 2254(d)." *Canaan v. McBride*, 395 F.3d 376, 382 (7th Cir. 2005). "As a practical matter, a federal court cannot apply the deferential standard provided by § 2254(d) in the absence of any state court decision on the issue." *Id.* Instead, it must "dispose of the matter as law and justice require," 28 U.S.C. § 2243, "which is essentially de novo review," *Duncan*, 819 F.3d at 941 (citation omitted). This principle applies to a *Strickland* claim's individual prongs. If "the state court did not address the deficiency prong of the *Strickland* analysis," then a federal court reviews that prong de novo. *Id.*

That is the case here. The "last reasoned state-court decision on the merits" is the Indiana Court of Appeals' decision affirming the denial of McMullen's petition for postconviction relief. *See Flint v. Carr*, 10 F.4th 786, 796 (7th Cir. 2021). The district court correctly determined that the state court "did not explicitly find that trial counsel's performance was reasonable." (RSA at 16.) At the outset, the state court recited *Strickland*'s two elements and concluded "McMullen has not met that burden." *McMullen II*, 2018 WL 3131420, at *11. It stated: "We initially note that Lewis did argue several mitigating circumstances at McMullen's sentencing hearing," and then listed them. *Id.* But the court never actually decided whether counsel's performance was deficient. *See*

*id.* It immediately moved on to prejudice. *Id.*

The court further telegraphed its intent to address only the prejudice prong of McMullen's sentencing claim in several ways. First, it noted that it was not required to address both prongs. *Id.* at *3. Second, it expressly disclaimed making any finding as to deficient performance with respect to two of McMullen's other *Strickland* claims. *See id.* at *5. Third, in the section on cumulative error, the court summarized: "McMullen's claims that he received ineffective assistance of counsel are without merit, *either* because Lewis's performance was not deficient, *or* because McMullen was not prejudiced by any alleged deficient performance." *Id.* at *12 (emphases added). Fourth, the court made explicit findings of no deficient performance in adjudicating some of McMullen's other *Strickland* claims, further distinguishing its analysis of the sentencing claim. *Id.* at *6, *10, *14. Accordingly, the Court should review de novo this prong of the claim.

## B. Trial counsel's performance at sentencing was constitutionally deficient.

Establishing deficient performance requires showing "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. This is defined in terms of "prevailing professional norms" and evaluated "considering all the circumstances." *Id.* While a court's scrutiny of counsel's performance is generally "highly deferential," *id.* at 689, the further counsel's actions stray from established norms, the less they are deferred to. *See Wiggins v.*

*Smith*, 539 U.S. 510, 521–22 (2003); *Strickland*, 466 U.S. at 690–91.

Counsel must "conduct a prompt investigation of the circumstances of the case" and "explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (citation omitted). At sentencing, "defense counsel must make a significant effort, based on reasonable investigation and logical argument to ably present the defendant's fate to a [sentencer] and to focus the attention of the [sentencer] on any mitigating factors." *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir. 1989). "[C]ounsel may not treat the sentencing phase as nothing more than a mere postscript to the trial." *Id.*

### 1. Failure to conduct a reasonable investigation into McMullen's background

"[U]nder the prevailing professional norms at the time of [McMullen's] trial, counsel had an obligation to conduct a thorough investigation of the defendant's background." *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (cleaned up). Counsel's "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at 524 (cleaned up). In determining whether counsel's investigation was reasonable, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to

investigate further." *Id.* at 527. In assessing counsel's actions as a matter of strategy, courts "evaluate counsel's conduct from the perspective at the time the decision was made to forgo the investigation." *Brown v. Sternes*, 304 F.3d 677, 692 (7th Cir. 2002).

Lewis performed no investigation into McMullen's background beyond reading the PSR. He did not search for or request documents from anyone. He did not speak with McMullen's friends or family members besides Anna Parcher, or meet with McMullen before the hearing to develop their case for presenting mitigating circumstances. Thus, "counsel did not even take the first step of interviewing witnesses or requesting records." *Porter*, 558 U.S. at 39.

Beyond that, Lewis "ignored pertinent avenues for investigation of which he should have been aware." *Id.* at 40. First, as the district court noted, "there were red flags in the PSR that should have prompted trial counsel to delve into Mr. McMullen's background." (RSA at 17.) Namely, McMullen's statements that he was abused, he was removed from his mother's care at age seven, and his parents had criminal records. (R. 8 at 9, 13.) Second, Lewis stated he was "well aware of [McMullen's] difficult upbringing" from prior conversations with McMullen's grandmother. (LA at 251.) Third, Lewis knew the importance of mitigation evidence from his experience on the public defender board and training in capital defense.

This case shares many similarities with *Wiggins v. Smith*, in which the Supreme Court found deficient performance despite the presence of AEDPA deference. 539 U.S. at 534. There, defense "counsel had available to them the written PSI, which included a one-page account of Wiggins' 'personal history' noting his 'misery as a youth,' quoting his description of his own background as 'disgusting,' and observing that he spent most of his life in foster care." *Id.* at 523 (cleaned up). They also obtained social services records documenting Wiggins' placement in foster care. *Id.* But "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. Further investigation would have uncovered evidence of "severe privation and abuse in the first six years of [Wiggins'] life while in the custody of his alcoholic, absentee mother" and "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." *Id.* at 535.

The Supreme Court found that "[c]ounsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the [applicable] professional standards." *Id.* at 523. In holding that trial counsel's performance was deficient, the Court focused not on whether counsel should have presented a mitigation case, but rather "on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself*

*reasonable.*" *Id.* at 523. "Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to the sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation to support that strategy." *Id.* at 527. The Court held that counsel's performance was deficient, as they "uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless." *Id.* at 525.

The same is true here. The lack of investigation into McMullen's background—a bad decision made worse by all the red flags Lewis ignored—meant that Lewis never discovered the details of McMullen's "very significant history of childhood and adolescent trauma, which included physical abuse, neglect, and witnessing horrific domestic violence." (LA at 166.) Lewis's vague determination that "mitigation would [not] stack up" in McMullen's case does not excuse his decision to not even try to develop such evidence. (*Id.* at 252); *see Williams v. Taylor*, 529 U.S. 362, 396 (2000) (concluding that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background"); *Austin v. Bell*, 126 F.3d 843, 849 (6th

Cir. 1997) (finding ineffective assistance where counsel failed to investigate and present mitigation "because he didn't think it would do any good"). Lewis's inaction resulted not from a strategic decision, "but rather an abdication of advocacy." *Austin*, 126 F.3d at 849.

### 2. Failure to have McMullen evaluated by a mental health professional or otherwise investigate his mental health

Regarding McMullen's mental health, Lewis again "did not even take the first step of interviewing witnesses or requesting records." *Porter*, 558 U.S. at 39. He did not consider having McMullen evaluated by a mental health professional. And "he ignored pertinent avenues for investigation of which he should have been aware." *Id.* Here as well, the PSR contained red flags that should have spurred Lewis out of his inaction. It included McMullen's statements that he was concerned about depression, was referred to counseling as a child, and abused alcohol to cope with his cousin's murder. (R. 8 at 11; *see* LA at 217.) The PSR specifically mentioned McMullen's counseling at YOC. (*Id.*) This made the YOC report—detailing McMullen's childhood diagnoses with multiple mental disorders and his "low average cognitive ability," (LA at 196)—"reasonably available." *Wiggins*, 539 U.S. at 524 (cleaned up); *cf. Brewer v. Aiken*, 935 F.2d 850, 857 (7th Cir. 1991) (holding "defense counsel's failure to investigate the mental history of a defendant with low intelligence demonstrates conclusively"

deficient performance). "Counsel thus failed to uncover and present any evidence of [McMullen's] mental health or mental impairment." *Porter*, 558 U.S. at 40.

Lewis's "failure to investigate [McMullen's] mental history appears even more egregious when viewed in conjunction with the testimony of" Dr. Kohli. *Brewer*, 935 F.2d at 858. She diagnosed McMullen with additional mental health disorders that were not addressed in the YOC report, including PTSD. Her report thus shows even more mitigating evidence that Lewis failed to develop or discover.

### 3. Failure to present sufficient evidence of mitigating circumstances at sentencing

At the sentencing hearing, Lewis did not introduce a single piece of evidence or call a single witness. His complete failure to investigate McMullen's background and mental health demonstrate that this was not a strategic decision but rather an inevitable consequence of his prior lack of diligence. In *Wiggins*, "counsel attempt[ed] to justify their limited investigation as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead." 539 U.S. at 521. In rejecting that claim, the Supreme Court "defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments." *Id.*; *see Strickland*, 466 U.S. at 690–91. "If counsel has investigated witnesses and consciously decided

not to call them, the decision is probably strategic. An outright failure to investigate witnesses, however, is more likely to be a sign of deficient performance." *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) .

As discussed above, Lewis's decision to limit his investigation to reviewing the PSR—and take no other action—fell far outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Moreover, Lewis's only stated reason for failure to present any mitigating evidence was that he "didn't think that mitigation would stack up," and he could not identify any alternative strategy that he pursued instead. (LA at 252); *see Karis v. Calderon*, 283 F.3d 1117, 1139 (9th Cir. 2002). This shows that "no discernable strategy was at work here." *Miller v. Martin*, 481 F.3d 468, 473 (7th Cir.), *as amended* (Mar. 19, 2007), *as amended* (Apr. 24, 2007), *amended*, 223 F. App'x 489 (7th Cir. 2007). Counsel's performance throughout the sentencing phase was constitutionally deficient.

## II.    Prejudice

### A.    Standard of review

The Indiana Court of Appeals addressed the second prong of McMullen's sentencing claim on the merits. *McMullen II*, 2018 WL 3131420, at *11–12. McMullen therefore must show that the court's decision "was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). "[T]he rule set forth in *Strickland* qualifies as 'clearly established Federal law.'" *Williams*, 529 U.S. at 391.

"An unreasonable application occurs when a state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case." *Rompilla*, 545 U.S. at 380 (cleaned up). Here, McMullen must show the state court's decision was "not only incorrect or erroneous but objectively unreasonable." *Id.* (cleaned up).

## B. The mitigating evidence that counsel failed to discover and present was compelling.

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It is less than a preponderance of the evidence. *See Porter*, 558 U.S. at 44. In the sentencing context, a petitioner need only show "a reasonable probability that [he] would have received a different sentence after a constitutionally sufficient mitigation investigation." *Sears v. Upton*, 561 U.S. 945, 956 (2010) (per curiam). That is, "[t]he question isn't whether [McMullen's] prison term would

have been *drastically* shorter—just whether it was reasonably likely that the prison term would not have been as long."[6] *In re Sealed Case*, 573 F.3d 844, 852 (D.C. Cir. 2009) (emphasis added); *see Lafler*, 566 U.S. at 165 ("[I]neffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because any amount of additional jail time has Sixth Amendment significance." (cleaned up)).

In cases alleging failure to investigate mitigation, the Court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. This includes "the evidence adduced in the [postconviction] proceeding." *Williams*, 529 U.S. at 397.

Evidence regarding social background and mental health is "relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California*, 494 U.S. 370, 382, (1990) (cleaned up). Mitigation evidence also functions to allow the sentencer to make a "reasoned moral judgment" about whether a defendant deserves mercy in spite of his conduct. *See*

---

[6] Because McMullen received the statutory maximum sentence, this case shares an attribute with the Supreme Court's capital cases discussed herein: no higher sentence was available to the sentencer.

*Sawyer v. Whitley*, 505 U.S. 333, 370 (1992) (Stevens, J., concurring).

The mitigating evidence that Lewis failed to present was significant and compelling. The district court summarized it thus:

> Mr. McMullen's childhood was, in his words, "complete chaos." His mother was addicted to cocaine and used drugs while she was pregnant with him. His father was not involved in his life, and Mr. McMullen was told that his father beat his mother while she was pregnant with him to induce a miscarriage. Mr. McMullen's mother had boyfriends that abused her in front of Mr. McMullen and his sister, including one, named Rodney, who burned her stomach with an iron and another who held a gun to her head in front of the children and asked them why he shouldn't kill their mother right then. Rodney also abused Mr. McMullen, kicking, punching, and choking him and throwing him down the stairs. When Rodney became particularly abusive, Mr. McMullen tried to call the police and have him arrested for domestic violence and supplying his mother with drugs, to no avail.

> Mr. McMullen was afraid of the police as a child after they conducted several raids where they entered his residence using a battering ram and smoke bombs and held him and his family at gunpoint. Mr. McMullen was eventually placed with his paternal grandmother, who was not physically abusive but did leave him alone on the weekends from the age of seven to eleven while she visited her boyfriend in another city. His childhood trauma caused him to develop migraines at the age of six, and he first experienced suicidal ideation at seven. Mr. McMullen began selling drugs as a teenager at the urging of his mother's abusive boyfriend and because he wanted to financially support his mother. Despite his troubled childhood, Mr. McMullen was described as an active father who provided for his children financially and emotionally. Based on his psychosocial history and psychological testing, Dr. Kohli diagnosed Mr. McMullen with panic disorder, posttraumatic stress disorder, substance use disorder, antisocial personality disorder, and possible depressive disorder.

(RSA at 17–18 (paragraph break added and record citations omitted).)[7]

This evidence constitutes the "kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability." *Wiggins*, U.S. at 535. McMullen's "childhood history of physical abuse" is similar to evidence the Court found compelling in *Porter v. McCollum*: "Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child. Porter's father was violent every weekend, and by his siblings' account, Porter was his father's favorite target, particularly when Porter tried to protect his mother." 558 U.S. at 33; *see also Rompilla*, 545 U.S. at 391–92 ("Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal

---

[7] The references to "Rodney" appear to be referring to Ronnie Persaud, not McMullen's father, Rodney Fouce.

abuse." (citation omitted)). Like the petitioners in the cases examined by the Supreme Court, McMullen's childhood was nothing short of "nightmarish." *Williams*, 529 U.S. at 395.

McMullen's diagnoses of several mental disorders and family history of mental illness also constitute compelling mitigating evidence. *See Hamblin v. Mitchell*, 354 F.3d 482, 487 n.2 (6th Cir. 2003). His PTSD is particularly relevant. Indiana law now lists as a statutory "mitigating circumstance[ ] or as favoring suspending the sentence and imposing probation" the fact that the defendant "has posttraumatic stress disorder." Ind. Code Ann. § 35-38-1-7.1(b)(13) (2015). Indiana courts have considered PTSD as a significant mitigating factor for longer. *E.g.*, *Reid v. State*, 876 N.E.2d 1114, 1117 (Ind. 2007) (reducing fifty-year sentence to thirty due in part to the defendant's "history of mental health problems," including PTSD). And federal courts have found prejudice under *Strickland* where counsel failed to present evidence of the defendant's PTSD diagnosis. *See, e.g.*, *Reddy v. Kelly*, 657 F. App'x 531, 547 (6th Cir. 2016); *Miller v. Dretke*, 420 F.3d 356, 366 (5th Cir. 2005); *see also Bell v. Cone*, 535 U.S. 685, 705 n.1 (2002) (Stevens, J., dissenting) ("The PTSD from which respondent allegedly suffered would sensibly have been used by [counsel] as mitigation in the penalty phase.").

Further, while falling short of a formal diagnosis, the YOC report's finding

that McMullen had "low average cognitive ability" as a child constitutes additional mitigating evidence. (LA at 195); *cf. Rompilla*, 545 U.S. at 392 (discussing Rompilla's "impair[ed]" cognitive functions). Thus, the mitigating evidence that Lewis failed to discover and present to the sentencing court was strong, detailed, and persuasive.

### C.    The state court unreasonably applied *Strickland* in finding counsel's performance did not prejudice McMullen at sentencing.

The Indiana Court of Appeals nevertheless found there was no reasonable probability that the trial court would have imposed any sentence lower than the statutory maximum had Attorney Lewis presented this evidence. The court's opinion shows its "prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence," including "the evidence adduced in the [postconviction] proceeding[,] in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397–98. Four errors by the court support this conclusion.

### 1.    The state court's ruling that the unpresented mitigating evidence was cumulative is "objectively unreasonable."

First, the court found that the unpresented evidence was merely cumulative: "because of the presentence investigation report, the sentencing court was already well aware of McMullen's background and any mental health concerns." *McMullen II*, 2018 WL 3131420, at *12. The record shows otherwise.

The PSR's only mention of any mental health disorder was McMullen's statement that he "had some concerns about depression." (R. 8 at 11.) It did not reference specific diagnoses of medically recognized mental health disorders. Nor did it mention the manifestations of McMullen's acute trauma during his childhood, including his severe stutter, excruciating migraines, and suicidal ideations at age seven. Instead, McMullen's unknowingly incorrect statement that he had "never been diagnosed with a mental health disorder" and statement that his mental health was "oaky [sic]" further obscured from the sentencing court an accurate view of McMullen's mental health. (*See id.*; LA at 224.) The trial court's explicit finding that it did not accept any mitigating circumstances other than the effect McMullen's incarceration would have on his dependents further demonstrates the PSR's failure to bring mental health to the court's attention.

As for McMullen's background, it's true that the PSR contained some mention of the abuse he suffered as a child. But it barely scratched the surface, and its references were vague and undescriptive. It briefly mentioned his mother's boyfriend dealing drugs and "abus[ing]" his family, his mother's addiction, and his removal from her care. (R. 8 at 9, 13.) It did not even specify what kind of abuse was occurring (physical, mental, emotional, other) or how prevalent or severe the abuse was. Because he only relied on the PSR, Lewis's argument to the trial court at sentencing was similarly vague on this point. (*See*

LA at 78–79.)

This means that the trial court was *not* aware that, as a child, McMullen witnessed his mother's boyfriends beat her, burn her with an iron, and hold a gun to her head; that he witnessed his sister Sharmaine being sexually abused; that he witnessed Ronnie Persaud beat Sharmaine, blindfold her, and smother her until she was close to passing out; that Ronnie beat, punched, kicked, and choked McMullen regularly; that the houses McMullen stayed in were frequently raided at gunpoint by police using battering rams and smoke bombs; or that his father beat his mother while pregnant with him, intending to induce a miscarriage. The court did not know that, as a child, McMullen's mother "told him he was worthless," (LA at 116); that Ronnie constantly belittled him; that he was separated from his beloved sister; or that he endured constant bullying in school and in the community for his severe stutter and his parents' addictions.

As the district court observed, this evidence "was much more detailed and compelling than the generic references to abuse mentioned in [the] PSR." (RSA at 17.) The Supreme Court's detailed discussions of the petitioners' backgrounds in *Porter*, *Rompilla*, *Wiggins*, and *Williams* (all of which granted habeas relief) illustrate the power of having specific rather than general information concerning a defendant's background. *See Porter*, 558 U.S. at 33–36; *Rompilla*, 545 U.S. at 391–92; *Wiggins*, 539 U.S. at 516–17; *Williams*, 529 U.S. at 395; *see also Bridges*

*v. Beard*, 941 F. Supp. 2d 584, 620 (E.D. Pa. 2013) ("[A] full mitigation presentation would have shown the chaotic and unstable home in which Bridges was raised, one that exposed him at an early age to drug use and physical abuse. This evidence could well have convinced the jury that Bridges was less culpable for his criminal behavior."), *as amended* (May 1, 2013), *aff'd sub nom. Bridges v. Sec'y of Penn. Dep't of Corr.*, 706 F. App'x 75 (3d Cir. 2017).

Additionally, all of the PSR's scant evidence regarding McMullen's background and mental health came from McMullen himself. Thus, the sentencing court "could easily have dismissed such testimony as not credible" and "self-serving." *Dretke*, 420 F.3d at 366. The court's refusal to accept McMullen's background as a mitigating factor at all (and complete failure to mention his mental health) supports this. (*See* LA at 82.) The sworn testimony of roughly twenty people and medical findings of two clinical psychologists corroborating McMullen's statements would have carried much more weight. *Cf. Scheckel v. State*, 620 N.E.2d 681, 686 (Ind. 1993) (characterizing testimony of fourteen witnesses as "substantial" mitigating evidence).

As the district court found, "the sentencing court did not have before it a comprehensive view of Mr. McMullen's traumatic childhood and related mental health issues." (RSA at 18–19.) Thus, "[t]his is not a case in which the new evi-

dence would barely have altered the sentencing profile presented to the sentencing judge." *Porter*, 558 U.S. at 41 (cleaned up). It would have painted a completely different picture, one more sympathetic to McMullen. Thus, the state appellate court's equating of the two was unreasonable.

### 2. The state court mischaracterized the nature and sources of much of the mitigating evidence.

The Indiana Court of Appeals characterized the unpresented evidence as "additional mitigating evidence that McMullen argues could have been offered by his friends and family." *McMullen II*, 2018 WL 3131420, at *12. Respectfully, this is a gross oversimplification. In addition to affidavits written by friends and family, the evidence submitted at postconviction included the affidavit of a licensed marriage and family therapist whom McMullen visited for counseling as a child, the CV and psychological evaluation report of Dr. Kohli, and the YOC report. The psychological evaluations are particularly crucial, as they contained the strongest mitigating evidence of McMullen's mental health and background (the Kohli report because it not only cogently summarized evidence from other sources but also included additional information from interviewing McMullen).

In *Williams*, the state court made a similar error. In finding no prejudice, it determined that the undiscovered, unpresented evidence at issue "barely would have altered the profile of this defendant that was presented to the jury" and "[a]t most, this evidence would have shown that numerous people, mostly

relatives, thought that defendant was nonviolent and could cope very well in a structured environment." 529 U.S. at 373 n.5 (citation omitted). In its opinion granting habeas relief, the Supreme Court quoted the district court's rejection of that inaccurate characterization:

> The Virginia Supreme Court ignored or overlooked the evidence of Williams' difficult childhood and abuse and his limited mental capacity. It is also unreasonable to characterize the additional evidence as coming from 'mostly relatives.' As stated, *supra*, Bruce Elliott, a respected professional in the community, and several correctional officers offered to testify on Williams['] behalf.

*Id.* (citation omitted).

The Indiana Court of Appeals' mischaracterization of the nature and source of the unpresented mitigating evidence similarly shows that the court "ignored or overlooked" the most compelling evidence concerning McMullen's mental health and background. It appears the court relied heavily on the trial court's order denying McMullen's postconviction petition, which made the same error. *See McMullen II*, 2018 WL 3131420, at *12 (including and adopting two block quotes from the trial court's order); (LA at 102–103). This shows the court "failed to accord appropriate weight to the body of mitigation evidence available to trial counsel." *Williams*, 529 U.S. at 398.

### 3. The state court unreasonably dismissed mitigating evidence as not directly relating to the crimes of conviction.

The Indiana Court of Appeals' third error stems from its conclusion that

the unpresented evidence "would have done nothing to account for or explain the illegal possession of marijuana and cocaine for which McMullen was convicted." *McMullen II*, 2018 WL 3131420, at *12; *see Hurles v. Ryan*, 752 F.3d 768, 784 (9th Cir. 2014) ("[F]amily background may be a substantial mitigating circumstance when it is shown to have some connection with the defendant's offense-related conduct." (citation omitted)). This is demonstrably incorrect. A large portion of the evidence presented to the postconviction court concerned the nearly ubiquitous use and sale of cocaine McMullen was exposed to and indoctrinated into during his childhood. This included his mother's addiction to that drug, her boyfriend Ronnie's constant dealing of that drug out of their home, and McMullen's participation in that dealing as a child, motivated by fear of physical abuse and a desire to break his family's financial dependence on their abuser. At the time of the offense, McMullen was not far removed from that childhood, just twenty-two years old.

Beyond that, mitigating evidence need not directly relate to the offense to be relevant. "[T]he Supreme Court ha[s] recognized that while demonstrating such a causative 'nexus' between painful life experiences and the commission of the offense is one way in which mitigating evidence can be expected to alter a sentencing outcome, it is certainly not the only one." *Doe v. Ayers*, 782 F.3d 425, 462 (9th Cir. 2015) (collecting cases); *see Smith v. Texas*, 543 U.S. 37, 45 (2004)

(rejecting the view that the lack of a "link or nexus between [a defendant's] troubled childhood or his limited mental abilities and th[e] capital murder" makes such evidence irrelevant at sentencing). Consistent with this notion, Indiana law gives courts broad discretion to consider appropriate factors when determining a sentence. *See* Ind. Code Ann. § 35-38-1-7.1(c) (2008). Thus, to the extent the Indiana Court of Appeals "impos[ed] a nexus requirement," its "decision on *Strickland*'s prejudice prong was contrary to Supreme Court law." *Burns v. Mays*, 31 F.4th 497, 519 (6th Cir. 2022) (Stranch, J., dissenting); *see Barwick v. Sec'y, Fla. Dep't of Corr.*, 794 F.3d 1239, 1256 (11th Cir. 2015) ("Failure to give any consideration to Barwick's child abuse [because it purportedly did not result in or contribute to his criminal behavior] would be contrary to clearly established federal law."); *see also* 28 U.S.C. § 2254(d)(1).

Relatedly, in *Williams*, the Supreme Court stressed that "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." 529 U.S. at 398. It concluded that because the state court "did not entertain that possibility," it "failed to accord appropriate weight to the body of mitigation evidence available to trial counsel." *Id.* The same is true here. The Indiana Court of Appeals' decision unreasonably dismissed relevant mitigating evidence that it wrongly concluded had no relation to McMullen's convictions.

### 4. The state court unreasonably failed to consider the mitigating evidence's effect on the aggravating circumstances.

The Indiana Court of Appeals also failed to consider the unpresented evidence's undermining effect on the prosecution's aggravation case. At sentencing, the prosecutor identified McMullen's "previous criminal history" as the "heaviest" aggravating factor and discussed it at length. (LA at 75–76.) He argued that McMullen "ha[d] been a menace to this community since the age of ten years old" and "ha[d] no social redeeming factors." (*Id.* at 76.) The trial court found this argument persuasive. It identified McMullen's "criminal record [a]s a significant aggravating factor" and ultimately imposed the statutory maximum sentence of fifty years. (*Id.* at 81.)

The Indiana Court of Appeals relied heavily on this aggravating circumstance in finding no prejudice under *Strickland*. It quoted *McMullen I*'s discussion of McMullen's criminal history in rejecting his initial challenge to his sentence. *McMullen II*, 2018 WL 3131420, at *11. (Of course, the court did not have the benefit of any of the evidence presented to the postconviction court when it issued that opinion.)

McMullen was only twenty-two at the time of the offense. A large portion of his criminal history occurred while he was still a child enduring the extreme physical abuse, emotional abuse, and neglect discussed above. Placing McMullen's criminal history in context would have allowed the sentencing court to see

the full picture of who McMullen was and why he engaged in certain behaviors.

For example, the PSR recounted that McMullen was charged with robbery at age thirteen. (R. 8 at 3.) What the trial court did not know was that McMullen committed the crime to raise money to buy a firearm he could use to protect his mother from her boyfriend Ronnie's severe, constant physical abuse. (LA at 115.) This was after McMullen's attempts to turn Ronnie in to the police had failed. "This evidence might not have made [McMullen] any more likable to the [sentencing court], but it might well have helped the [court] understand" him. *Sears*, 561 U.S. at 951. Without this context, the trial court had a woefully incomplete picture of McMullen, painted almost entirely by a probation officer and a prosecutor.

The evidence that Lewis failed to discover or introduce would have humanized McMullen and offered an alternative to the prosecutor's label of "menace to th[e] community" with "no social redeeming factors." *See Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) (explaining that a defendant's attorney must conduct a proper investigation to "find witnesses to help humanize the defendant"); *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000) (noting that "mitigation evidence affords an opportunity to humanize and explain"). The district court noted that the sentencing court did not have before it "evidence of [McMullen's] positive characteristics to combat the State's portrayal of

him" discussed above. (RSA at 19.) Much of that evidence in the postconviction record concerned McMullen's active participation in his children's lives as a loving, attentive father and his effort to give them a better upbringing than he had. The trial court's acknowledgement that "undue hardship" to McMullen's children resulting from his incarceration qualified as a mitigating circumstance further indicts the Indiana Court of Appeals' failure to weigh this evidence against the aggravating circumstances. (*See* LA at 54.)

In addition to providing general evidence indicating McMullen may not have been as culpable as a neurotypical person, McMullen's mental health diagnoses would have rebutted the aggravating argument repeated by the state courts in this case that many previous attempts to rehabilitate him proved ineffective. *See McMullen II*, 2018 WL 3131420, at *11–12; (LA at 81, 103.) That is, McMullen was not receiving appropriate or effective treatment for his mental disorders because he had never been diagnosed as an adult or made aware of his childhood diagnoses at YOC. Armed with a full psychological report following a comprehensive evaluation, Lewis could have argued that with proper treatment, McMullen could be more effectively rehabilitated, rebutting the PSR's conclusion that his likelihood to reoffend was "very high." (R. 8 at 12); *see, e.g.*, *United States v. Adams*, 385 F. App'x 114, 117 (3d Cir. 2010) ("The court considered as

mitigating factors Adams' age and Dr. Hume's testimony that Adams could improve with adequate mental health treatment.").

The unpresented evidence regarding McMullen's background also could have been used to explain why many of the rehabilitative programs listed in the PSR were ineffective in his case. As a child, he was reliant on a drug-addicted mother and her abusive, drug dealing boyfriend for transportation, and they could not be counted on to take him to appointments. (LA at 226.) They also refused to participate in those programs themselves, when asked. (*Id.*) Other programs McMullen was ordered to participate in either did not exist or had been discontinued. (*Id.*) The trial court knew none of this when it sentenced him, and the Indiana Court of Appeals failed to consider this evidence.

***

In these ways, the Indiana Court of Appeals' determination that McMullen "was not prejudiced by his counsel's failure to conduct a thorough—or even cursory—investigation is unreasonable" because the court "either did not consider or unreasonably discounted the mitigation evidence adduced in the post-conviction hearing." *Porter*, 558 U.S. at 42. De novo review of the prejudice prong of McMullen's *Strickland* claim compels the conclusion that the undiscovered mitigating evidence "might well have influenced" the sentencing court's

appraisal of McMullen's moral culpability. *Williams*, 529 U.S. at 398; (*see* Section II.B., *supra*). Accordingly, "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (cleaned up).

### D. The state court's finding of no prejudice was based on an unreasonable determination of the facts.

"Under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010). As discussed above, the Indiana Court of Appeals' determination that McMullen suffered no prejudice from his counsel's failures at sentencing rested in large part on its erroneous conclusion that "because of the presentence investigation report, the sentencing court was already well aware of McMullen's background and any mental health concerns." *McMullen II*, 2018 WL 3131420, at *11.

"In affirmative sentences," the word "any" "means 'every' or 'all.'" Bryan A. Garner, *Garner's Modern English Usage* 57 (4th ed. 2016). That is the way in which it was used here: to conclude that McMullen suffered no prejudice because the unpresented evidence regarding mental health was cumulative. A comparison of the PSR with the voluminous mental health evidence accompanying the postconviction petition proves by clear and convincing evidence that

the trial court was *not* "already well aware" of "any mental health concerns." (This exercise also shows that the trial court was not "already well aware of McMullen's background," either, given the monumental difference in detail between the two sources on this issue.) Because neither the prosecution nor the defense introduced any evidence at sentencing, no other source could have made the trial court "well aware" of these facts. *See Wiggins*, 539 U.S. at 530–31.

In *Wiggins*, the state court similarly "based its conclusion, in part, on a clear factual error"—that social services records obtained by defense counsel contained "recorded incidences of [Wiggins'] sexual abuse" as a child. *Id.* at 528. But the records in fact "contain[ed] no mention of sexual abuse, much less of the repeated molestations and rapes of petitioner detailed [elsewhere]." *Id.* As a result, the Supreme Court concluded that the state court's "assumption that the records documented instances of this abuse has been shown to be incorrect by 'clear and convincing evidence,' and reflects 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* (citations omitted). Here, as in *Wiggins*, the state court's "reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision." *Id.*

Finally, McMullen incorporates the arguments in Sections II.C.2. and II.C.3., *supra*, as the court's mischaracterizations of the nature and sources of

the unpresented mitigating evidence and their purported lack of connection to McMullen's convictions also straddle the line between unreasonable application of law and unreasonable determination of fact.

## Conclusion

Respectfully, the Indiana Court of Appeals' decision showed over and over that it was simply not interested in evaluating the mitigating evidence that defense counsel failed to discover or present at sentencing. The court characterized the evidence as only coming from McMullen's friends and family when the most important parts did not. It stated the evidence was already before the sentencing court when the overwhelming majority was not (including the most important parts). It improperly dismissed mitigating evidence that it (wrongly) found did not directly relate to the convictions. And instead of reweighing the aggravating circumstances against the new mitigating evidence—as it was required to do—the court quoted prior decisions that either did not have access to that evidence (direct review) or also mischaracterized it as only coming from friends and family (postconviction denial). The court's decision was not merely wrong; it was "objectively unreasonable." *Wiggins*, 539 U.S. at 521. It therefore does not deserve AEDPA deference.

For the reasons discussed above, the Court should reverse the district court's judgment and remand with instructions to enter an order granting the

writ of habeas corpus unless the State of Indiana provides McMullen a new sentencing hearing within ninety days.

Filed: September 19, 2022.

Respectfully submitted,

RYAN T. MᴄMULLEN,
*By Counsel*

By    s/    *Benjamin S. Morrell*
Benjamin S. Morrell
Michael A. Mayerck
Tᴀꜰᴛ Sᴛᴇᴛᴛɪɴɪᴜs & Hᴏʟʟɪsᴛᴇʀ LLP
111 E. Wacker Dr.
Suite 2800
Chicago, IL 60601
(312) 527-4000
bmorrell@taftlaw.com
mmayerck@taftlaw.com

*Pro Bono Counsel for Petitioner-Appellant*

## Certificate of Compliance

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that the foregoing document complies with the type-volume limitation of Rule 32(a)(7)(B)(i), as modified by Circuit Rule 32(c). It contains 13,641 words.

I further certify that the foregoing document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6), as modified by Circuit Rule 32(b). It has been prepared using Microsoft Word 2016 in the proportionally spaced typefaces of Gill Sans MT (headings and captions) and Calisto MT (body), both in 14-point font size.

Dated: September 19, 2022.

By  s/ *Benjamin S. Morrell*
Benjamin S. Morrell
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Dr.
Suite 2800
Chicago, IL 60601
(312) 527-4000
bmorrell@taftlaw.com

*Pro Bono Counsel for Petitioner-Appellant*

**Certificate of Service**

I certify that on the date listed below, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: September 19, 2022.

By    s/    *Benjamin S. Morrell*
Benjamin S. Morrell
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Dr.
Suite 2800
Chicago, IL 60601
(312) 527-4000
bmorrell@taftlaw.com

*Pro Bono Counsel for Petitioner-Appellant*

No. 20-3273

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

RYAN T. McMULLEN,

Petitioner-Appellant,

v.

GARY DALTON and MELISSA STEPHENSON,

Respondents-Appellees.

---

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:19-cv-00356-JRS-MJD

---

## REQUIRED SHORT APPENDIX OF PETITIONER-APPELLANT

---

Benjamin S. Morrell
  *Counsel of Record*
Michael A. Mayerck

TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Dr.
Suite 2800
Chicago, IL 60601
(312) 527-4000
bmorrell@taftlaw.com
mmayerck@taftlaw.com

*Pro Bono Counsel for Petitioner-Appellant*

# Table of Contents

Statement That All Required Materials Are in Appendix.................................iii

Order Denying Petition for a Writ of Habeas Corpus.......................................1

Final Judgment............................................................................................26

## Statement That All Required Materials Are in Appendix

Counsel for Petitioner-Appellant McMullen hereby certifies that all of the materials required by Circuit Rule 30(a) are included in this Required Short Appendix. *See* 7th Cir. R. 30(d).

Date: September 19, 2022

s/ *Benjamin S. Morrell*
Benjamin S. Morrell
*Pro Bono Counsel for Petitioner-Appellant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

RYAN T. MCMULLEN,             )
                                          )
                 Petitioner,     )
                                            )
                v.            )       No. 2:19-cv-00356-JRS-MJD
                                            )
RICHARD BROWN Warden,     )
                                            )
                 Respondent.   )

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORUPUS**

Petitioner Ryan McMullen was convicted of possession of cocaine and possession of marijuana in an Indiana state court and sentenced to 50 years imprisonment. He now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Mr. McMullen alleges that he received ineffective assistance of trial counsel and appellate counsel. However, the Indiana Court of Appeals reasonably applied federal law when it determined that Mr. McMullen's attorneys were not ineffective. Therefore, Mr. McMullen's petition for a writ of habeas corpus is **denied**.

**I.**
**Background**

Federal habeas review requires the Court to "presume that the state court's factual determinations are correct unless the petitioner rebuts the presumption by clear and convincing evidence." *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018); *see* 28 U.S.C. § 2254(e)(1). On direct appeal, the Indiana Court of Appeals summarized the relevant facts and procedural history as follows:

> Greentree West Apartments ("Greentree") is a public housing complex in Marion with approximately fifty units. In January 2009, Julie Taylor, Greentree's manager, distributed fliers to the residents advising them of a future pesticide treatment in the units. The lease agreements informed the residents that pesticide treatments would be conducted two times per year. On January 8, 2009, Steve Gause, a

maintenance employee at Greentree, was treating Apartment 410 with pesticides and noticed a loaded assault weapon in one of the kitchen cabinets. Gause then contacted a detective with the Joint Effort Against Narcotics Drug Task Force ("the JEAN Team") and reported his observation of the firearm.

Marion Police Detective John Kauffman received an e-mail, warning police officers of a potential safety issue if they were called to Apartment 410. Detective Kauffman knew that Janita Glasser lived at the apartment and that she was the mother of McMullen's children. Detective Kauffman was aware that McMullen had been linked to previous incidents that involved weapons. Detective Kauffman obtained a mug shot of McMullen and showed it to Gause, who confirmed that McMullen had been staying at the apartment. Detective Kauffman discovered that there was an active warrant for McMullen's arrest in an unrelated matter.

Thereafter, JEAN team members went to Greentree to conduct surveillance and serve the arrest warrant on McMullen. McMullen's vehicle was parked near Apartment 410, and Detective Kauffman saw several individuals go into that apartment for short periods of time. Based on his experience as a police officer, Detective Kauffman believed that such conduct was indicative of drug activity. Various members of the JEAN Team were also familiar with McMullen's previous drug and weapons charges. At some point, Detective Kauffman observed a known drug user leave the apartment. Detective Kenneth Allen stopped her vehicle near Greentree and explained that the police were looking for "Pat." Tr. p. 79. The individual said that she had just left Greentree and had spoken with "Ryan" in Apartment 410. Tr. p. 79. Although the woman tried to purchase crack cocaine from "Ryan," who was subsequently identified as McMullen, he refused to sell her any drugs because she had "too much drama." Tr. p. 295.

Several police officers then approached the apartment and one of the detectives looked through the front window blinds that were partially open. Detective Allen looked through the window and saw McMullen sitting on the couch. Thereafter, a detective knocked on the door, held up his police badge, and said, "Ryan, this is the police. We have a warrant for your arrest. Come to the door. Open the door now." Tr. p. 64. McMullen got up from the couch, released the blinds, stepped away from the window, and moved toward the kitchen where Gause had seen the weapon. Tr. at 64–65. The police officers then entered the apartment and took McMullen into custody. Detective Kauffman smelled marijuana and saw an infant on the couch. After releasing the infant to her mother, the officers obtained a search warrant for the apartment.

During the course of the search, the officers recovered nearly eighteen grams of cocaine, one kilogram of marijuana, and a nine millimeter handgun.

2

*McMullen v. State*, 950 N.E.2d 37, 2011 WL 2507057 at *1–2 (Ind. Ct. App. June 23, 2011) ("*McMullen I*").[1]

Mr. McMullen was charged with two counts of possession of cocaine, one count of dealing in cocaine, one count of possession of marijuana, one count of neglect of a dependent, and was alleged to be a habitual offender. *Id.* at *4. After Mr. McMullen unsuccessfully moved to suppress the evidence that the police had discovered during the search, the jury found him guilty of two counts of possessing cocaine and one count of possessing marijuana. *Id.* at *4–6. The trial court entered judgment of conviction for one count of possessing cocaine and one count of possessing marijuana. *Id.* at *3. The trial court sentenced Mr. McMullen to 50 years, citing his lengthy criminal history and his failure to report for incarceration after being released from jail as aggravating factors. *Id.* The sole mitigating factor was the undue hardship that Mr. McMullen's incarceration would have on his dependents. *Id.*

On appeal, Mr. McMullen challenged the admission of the evidence that police discovered during the search and his sentence. *Id.* at *3–6. The Indiana Court of Appeals held that the evidence was admissible and affirmed Mr. McMullen's sentence. *Id.* Mr. McMullen raised both issues in a petition to transfer, which the Indiana Supreme Court denied. Dkt. 6-7, dkt. 6-2 at 5.

Following his direct appeal, Mr. McMullen filed a petition for state post-conviction relief alleging that his trial and appellate attorneys were ineffective. After an evidentiary hearing, the post-conviction court denied his petition. Dkt. 6-8 at 6–7. The Indiana Court of Appeals affirmed, concluding that Mr. McMullen did not receive ineffective assistance from trial or appellate counsel. *McMullen v. State*, 102 N.E.3d 947, 2018 WL 3131420, *14. (Ind. Ct. App. June 27, 2018) ("*McMullen II*").[2] The Indiana Supreme Court subsequently denied transfer. Dkt. 6-9 at 8.

---

[1] *McMullen I* is in the record at Docket 6-6.
[2] *McMullen II* is in the record at Docket 6-13.

Mr. McMullen filed the instant petition for a writ of habeas corpus on July 26, 2019, alleging that his counsel was ineffective at trial, at sentencing, and on appeal.

## II.
## Applicable Law

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") directs how the Court must consider petitions for habeas relief under § 2254. "In considering habeas corpus petitions challenging state court convictions, [the Court's] review is governed (and greatly limited) by AEDPA." *Dassey v. Dittmann*, 877 F.3d 297, 301 (7th Cir. 2017) (en banc) (citation and quotation marks omitted). "The standards in 28 U.S.C. § 2254(d) were designed to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Id.* (citation and quotation marks omitted).

A federal habeas court cannot grant relief unless the state court's adjudication of a federal claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The decision federal courts look to is the last reasoned state-court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey*, 877 F.3d at 302. "Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas

4

court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision[.]" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (citation and quotation marks omitted). "This is a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion." *Id.* "In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*

"For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. "The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct. The issue is whether the decision was unreasonably wrong under an objective standard." *Dassey*, 877 F.3d at 302. "Put another way, [the Court] ask[s] whether the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). "The bounds of a reasonable application depend on the nature of the relevant rule. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Schmidt v. Foster*, 911 F.3d 469, 477 (7th Cir. 2018) (en banc) (citation and quotation marks omitted).

### III.
### Discussion

A criminal defendant has a right under the Sixth Amendment to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To succeed on a claim that

counsel was ineffective, a petitioner must show (1) that counsel's performance "fell below an objective standard of reasonableness" and (2) "that the deficient performance prejudiced the defense." *Id.* at 687−88. Where § 2254(d) applies, courts apply two layers of deference in assessing counsel's performance: "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

The last reasoned opinion at issue here is the Indiana Court of Appeals' decision affirming the denial of Mr. McMullen's petition for post-conviction relief. The Indiana Court of Appeals correctly articulated the *Strickland* standard in Mr. McMullen's post-conviction memorandum decision. *McMullen II*, 2018 WL 3131420 at *3. Mr. McMullen complains about several aspects of trial counsel and appellate counsel's performance. The Court will address each in turn.

**A.  Ineffective Assistance of Trial Counsel at Trial**

Mr. McMullen alleges that his trial counsel performed deficiently in several respects throughout trial and that he was prejudiced by the cumulative effect of those errors. The Indiana Court of Appeals analyzed the errors individually and examined the cumulative impact that any errors may have had.

**i.      Failure to Call Witnesses**

Mr. McMullen's defense theory at trial was that someone else had placed the cocaine in the cabinet; he admitted the marijuana was his because his fingerprints were recovered from the packaging. DA Tr. 189. For the reasons explained in more detail below, the Indiana Court of

Appeals reasonably determined that trial counsel was not ineffective for failing to call three witnesses.

### a. Stephen Gause

Stephen Gause was the property manager at Greentree who set the investigation into motion. Mr. McMullen alleges that counsel's failure to call Mr. Cause was deficient because (1) he referenced Mr. Gause's expected testimony in his opening statement, and (2) Mr. Gause would have testified that he saw only a firearm in the cabinet. According to Mr. McMullen, this would have supported the defense theory that someone else placed the cocaine in the cabinet.

As the Seventh Circuit recently observed, "[m]aking false promises about evidence in an opening statement is a surefire way for defense counsel to harm his credibility with the jury." *Myers v. Neal*, --- F. 3d ---, 2020 WL 5552196, *7 (7th Cir. Aug. 4, 2020) (deficient assistance is prejudicial when absent cumulative effects of counsel's shortcomings "there is a 'reasonable probability' that the trial would have come out differently") (citing *Strickland,* 466 U.S. at 694). But the Indiana Court of Appeals reasonably concluded that trial counsel's failure to call Mr. Gause was not even deficient.  Trial counsel stated during opening statement that, "Mr. Steve Gause who is a Greentree employee, uh, is in the apartment spraying for bugs … [a]nd he opens the cabinet and he notices the firearm described in the cabinet and that's all he sees. And that's at one p.m. And there's nothing else in that cabinet except the firearm." DA Tr. 190.[3] As the Indiana Court of Appeals observed, trial counsel did not explicitly promise that he was going to call Mr. Gause as a witness.

Further, trial counsel testified at the post-conviction hearing that his decision not to call Mr. Gause as a witness was tactical. He testified that he "would've wanted him on cross examination and not on direct," because if the State was provided the opportunity to cross examine Mr. Gause,

---

[3] The Court will cite to the trial court transcript as "DA Tr." and the post-conviction hearing transcript as "PCR Tr."

it would have been able to elicit harmful testimony about "why he was interested in this particular apartment." PCR Tr. 9–10. When an attorney "articulates a strategic reason for a decision that was sound at the time it was made, the decision cannot support a claim of ineffective assistance of counsel." *Yu Tian Li v. United States*, 648  F.3d 524, 528 (7th Cir. 2011). Thus, trial counsel's decision not to call Mr. Grause was not deficient performance.

### b.  James Johnson

James Johnson is Mr. McMullen's cousin. If Mr. Johnson had been called as a witness, he would have testified that he went to the apartment between 3:00 and 3:30 in the afternoon with five other individuals, and shortly after his arrival he saw the firearm and marijuana in the cabinet but no cocaine. Dkt. 7-9 at 39, ¶ 2. He further would have testified that a man whose name he could not recall kept going back and forth to the cabinet and, during that time, Mr. McMullen remained in the living room caring for his baby. *Id.* at 39, ¶¶ 5–6.

Trial counsel testified that he did not interview any of the people who were at the apartment that day but that he should have. PCR Tr. 11. The Indiana Court of Appeals bypassed whether this decision was deficient because it determined Mr. McMullen could not prove he was prejudiced by the failure to call Mr. Johnson for three reasons. First, Mr. Johnson's testimony would not show that someone other than Mr. McMullen put the cocaine in the cabinet because he did not allege that he actually saw anyone else do so. *McMullen II*, 2018 WL 3131420 at *5. Hence, his testimony would have been cumulative of other testimony at trial that at least five other people were at the apartment the day of Mr. McMullen's arrest. *Id.* Second, because Mr. Johnson is Mr. McMullen's cousin, the State would have been able to attack his testimony as biased. *Id.* Third, even assuming Mr. Johnson's testimony was true, because Mr. McMullen was not arrested until 6:30 p.m., there was still plenty of time for him to place the cocaine in the cabinet.  *Id.*

The Indiana Court of Appeals' assessment was reasonable. There is no reasonable probability that Mr. Johnson's vague testimony would have changed the outcome of the trial.

### c. Gerald Griffin

Gerald Griffin drove Michelle Garrett to Mr. McMullen's apartment and was pulled over by police after leaving the apartment. Mr. McMullen alleges that Mr. Griffin should have been called to testify that Ms. Garrett asked for a ride so that she could confront Mr. McMullen about a rumor that had gotten back to her husband. Mr. Griffin would have testified that Ms. Garrett never mentioned wanting to buy drugs from Mr. McMullen and that Mr. McMullen asked her to leave because he "did not want to be involved in her marriage." Dkt. 7-9 at 41. Mr. McMullen believes this testimony could have undermined Ms. Garrett's testimony that she went to the apartment to buy cocaine.

The Indiana Court of Appeals reasonably concluded that trial counsel was not ineffective for failing to call Mr. Griffin. *McMullen II*, 2018 WL 3131420 at *5. The information he would have provided was not inconsistent with Ms. Garrett's testimony at trial, where she testified there were rumors about her relationship with Mr. McMullen and he refused to sell her cocaine because she had "too much drama." DA Tr. 295–96. There is no reasonable probability Mr. Griffin's testimony would have changed the outcome at trial.

### ii.    Failure to Object to Evidence

Next, the Indiana Court of Appeals examined Mr. McMullen's allegations that trial counsel was ineffective for failure to object to several pieces of evidence during trial. *McMullen II*, 2018 WL 3131420 at *6. The Indiana Court of Appeals correctly recognized that trial counsel's performance could not have been deficient if the unraised objection would not have been sustained. *See Jones v. Brown*, 756 F.3d 1000, 1008-09 (7th Cir. 2014) ("If evidence admitted without

objection is, in fact, admissible, then failing to object to that evidence cannot be a professionally 'unreasonable' action.") (internal quotation marks and citations omitted). It also correctly recognized that, even if an objection would have been sustained, Mr. McMullen would still have to show that but for the failure to object, the outcome of his trial would have been different. *McMullen II*, 2018 WL 3131420 at *6.

### a.  McMullen's Arrest Warrant

The police arrested Mr. McMullen at the apartment due to an arrest warrant for failure to appear for an unrelated matter. Before trial, the court held a hearing on Mr. McMullen's motion to suppress and the State's intent to introduce evidence of the warrant. During the hearing, trial counsel objected to the State introducing evidence of the arrest warrant, citing Indiana Rule of Evidence 404(b). DA Tr. 132. Rule 404(b) provides in relevant part, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." The trial court ruled that the fact of the arrest warrant was admissible but that the facts or charges of the underlying case were not. Dkt. 7-1 at 31.

At trial, when the State began to elicit information about the arrest warrant, trial counsel objected, stating, "I request that the testimony and arguments, uh, at our pre-trial hearing be incorporated by referencing this motion, uh, in order to avoid repeating myself I would like to have this motion shown as a continuing objection." DA Tr. 195. The trial court overruled the objection. Three detectives alluded to the warrant during trial, testifying that Mr. McMullen was arrested on January 8, 2009, for the outstanding warrant, DA Tr. 195, 376; that he was not arrested in this case until May of 2009 because the police "knew he was going to be held on the unrelated matter," DA Tr. 380; and that he was a "wanted suspect," DA Tr. 246.

The Indiana Court of Appeals found that trial counsel "*did* make a continuing objection to

evidence of McMullen's arrest warrant since it was covered at the hearing on the motion to suppress," and therefore his performance was not deficient. *McMullen II*, 2018 WL 3131420 at *6 (emphasis in original). The court's conclusion that Mr. McMullen's continuing objection covered both the motion to suppress and the objection to evidence about the arrest warrant is a resolution to a state-law question. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Wilson v. Corcoran*, 526 U.S. 1, 5 (2010) (citation and quotation marks omitted); *see also Miller v. Zatecky*, 820 F.3d 275, 277 (7th Cir. 2016) ("A federal court cannot disagree with a state court's resolution of an issue of state law."). Such is true even when, as here, it is embedded in an ineffective assistance of counsel claim. "Although claims of ineffective assistance of counsel can be premised on an attorney's failure to raise state-law issues, federal courts reviewing such claims must defer to state-court precedent concerning the questions of state law underlying the defendant's ineffectiveness claim." *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013) (citations omitted). Because the Indiana Court of Appeals' decision regarding the objection rests on state law grounds, this Court will not review it.

Mr. McMullen also alleged that trial counsel was ineffective for not requesting a limiting instruction advising the jury that evidence about the warrant was only admissible to explain the officers' actions. The Indiana Court of Appeals found that asking for a limiting instruction was "the preferred practice" but found that Mr. McMullen failed to prove prejudice. *McMullen II*, 2018 WL 3131420 at *7. The court reasoned that "[t]he jury's knowledge that McMullen had an outstanding arrest warrant has nothing to do with the crimes he was convicted of. It simply provided the jury with additional context as to why McMullen was arrested on January 8, 2009." *Id.* In light of the evidence against Mr. McMullen, this was not an unreasonable conclusion.

11

### b.  Prior Bad Acts

Mr. McMullen next alleges that trial counsel should have objected to Ms. Garrett's testimony regarding alleged prior drug sales under Rule 404(b). Ms. Garrett's testimony was as follows:

> State: Had you been at [the apartment] on one or more occasions?
>
> Garrett: I went one other time.
>
> State: One other time. Uh, did you always meet with the defendant, Ryan McMullen?
>
> Garrett: Yes.

DA Tr. 296. The Indiana Court of Appeals found this testimony was not objectionable because Ms. Garrett was not asked and did not testify that she ever previously purchased cocaine from Mr. McMullen. The Court agrees—trial counsel was not ineffective for failing to object to admissible evidence. *Jones*, 756 F.3d at 1008-09.

### c.  Jail Calls and Letter

Mr. McMullen next argues that trial counsel should have objected under Rule 404(b) to jail calls in which he referenced his pending charge for failure to appear and his arrest warrant and a letter that Mr. McMullen had written from jail four years earlier that alluded to selling drugs.

Trial counsel testified that he did not think of objecting to these portions of the phone calls or request that they be redacted. PCR Tr. 13. The Indiana Court of Appeals held that trial counsel was not ineffective for failing to object to the portions of the phone calls where Mr. McMullen referenced his arrest warrant for failure to appear because, since evidence about the warrant had already been admitted, Mr. McMullen's statements were cumulative, and further the admission did "nothing to undermine McMullen's conviction on completely unrelated evidence and charges." *McMullen II*, 2018 WL 3131420 at *8.

Because the Indiana Court of Appeals previously decided that trial counsel had objected to the detectives' testimony about the arrest warrant, it did not decide whether the testimony about the arrest warrant was admissible, finding Mr. McMullen had waived the argument. *Id.* at *6, fn. 2 ("To the extent McMullen argues that the trial court erred when it allowed the State to introduce evidence of McMullen's arrest warrant, … this issue is waived because it was available at the time he filed his direct appeal."). Thus, the determination that the admission of Mr. McMullen's statements in the jail calls was merely cumulative is not helpful if evidence of his warrants should have been excluded. However, the Court agrees that Mr. McMullen cannot show he was prejudiced by his passing references to his arrest warrant for failure to appear in light of the evidence against him.

Trial counsel did not object to a letter that Mr. McMullen had written to his girlfriend from jail four years earlier. The letter stated in part, "I am gone [sic] get a job and sell weed and x. No more cocaine." Dkt. 7-3 at 43. The Indiana Court of Appeals found that the letter was admissible because it referenced *future* drug-related activity and was therefore relevant to his offenses in this case. *McMullen II*, 2018 WL 3131420 at *9. It further found that the statement in the letter actually supported Mr. McMullen's theory that he was selling only marijuana and not cocaine, and regardless, it was cumulative of other evidence. *Id.* Because the court's determination that the letter was admissible relied on state law, this Court cannot review this claim. *Shaw*, 721 F.3d at 914.

### d.  Witness Testimony

Mr. McMullen alleges that trial counsel should have objected to testimony from a detective who testified about whether particular facts—ownership of scales, higher quantities of drugs, etc.—were more or less consistent with dealing drugs and testimony that law enforcement had conducted drug investigations at Greentree Apartments in the past. The Indiana Court of Appeals

13

held that this testimony was admissible and therefore trial counsel was not ineffective for failing

to object. Again, because this determination rests on state law grounds, the Court cannot review

the claim.

### e.  Cumulative Error

When a court identifies multiple instances of deficient performance by trial counsel, it must

consider the cumulative impact of the errors when determining whether the defendant suffered

prejudice. *Sussman v. Jenkins*, 636 F.3d 329, 360–61 (7th Cir. 2011). Although the Indiana Court

of Appeals did not specifically find that trial counsel had performed deficiently, there were certain

issues in which the court bypassed the performance prong and looked only at prejudice. Thus, the

court still analyzed whether "any of [trial counsel's] alleged errors cumulatively did substantial

damage to McMullen's defense, i.e. that someone else placed the cocaine in the cabinet." *McMullen*

*II*, 2018 WL 3131420 at *13. The court summarized the evidence against Mr. McMullen:

> The jury heard testimony from Garrett that she went to the apartment to buy cocaine
> from McMullen on January 8, 2009. Officers then watched as at least five
> individuals went in and out of the apartment for short periods of time—conduct that
> is indicative of drug related activity. When officers executed the search warrant on
> the apartment, they obtained nearly eighteen grams of cocaine, one kilogram of
> marijuana, a nine-millimeter handgun, and a digital scale. Although there was no
> identifiably available fingerprints or DNA found on the baggie of cocaine, the State
> established that the DNA found on the baggie of marijuana was consistent with
> McMullen's DNA. And McMullen's fingerprints were found on the baggie of
> marijuana. All of the items were located next to each other in a kitchen cabinet.
> McMullen was also alone in the apartment with an infant when the search warrant
> was executed.

*Id.* Additionally, Mr. McMullen made a host of incriminating statements on the jail calls,

referencing "white bitch," a slang term for cocaine, asking his child's mother to locate "Christmas

presents" despite none being found in the search, and stating he knew he was going to be charged

with an A felony. DA Tr. 444–45. The Indiana Court of Appeals found no cumulative error.

The Court agrees. Given the strength of evidence against Mr. McMullen, the Indiana Court of Appeals' determination that all potential errors combined did not prejudice him was not unreasonable.

### B.  Ineffective Assistance of Trial Counsel at Sentencing

Mr. McMullen alleges that trial counsel was ineffective at sentencing because he failed to conduct a reasonable investigation into Mr. McMullen's background, arrange for Mr. McMullen to be evaluated by a mental health professional, and failed to present sufficient evidence of mitigating circumstances.

At the post-conviction evidentiary hearing, trial counsel testified that he did not develop mitigation beyond what was included in the presentence investigation report (PSR). PCR Tr. 15. Trial counsel was trained in representing capital clients, so he understood the importance of mitigation. *Id.* at 16. He did not petition the court for money to be able to conduct a mitigation investigation and acknowledged he "probably should have." *Id.* He had presented mitigation in non-capital cases with success, but did not think "that mitigation would stack up" in this case. *Id.* He did not consider requesting a mental health evaluation. *Id.*

The PSR mentioned Mr. McMullen's troubled childhood. Mr. McMullen told the probation officer who prepared the report that he was raised by his mother until age seven when he "was placed with his grandmother." Dkt. 8 at 14. He stated both his parents had criminal records. *Id.* Mr. McMullen stated he had never been diagnosed with a mental health disorder but was concerned about depression. *Id.* at 16. He had received counseling while placed at the Youth Opportunity Center (YOC) as a juvenile delinquent and after he was "removed from his mother's care due to abuse." *Id.* at 16. Mr. McMullen also mentioned that his mother had a boyfriend who abused his mother, sister, and him. *Id.* at 18.

At the sentencing hearing, the trial court noted that it had reviewed the PSR. DA Tr. 490. Trial counsel presented a brief argument, stating Mr. McMullen blamed only himself for his actions and arguing most of Mr. McMullen's criminal history was minor and the multitude of dismissals indicated a pattern of over-charging. *Id.* at 494–95. Trial counsel did not present any evidence about Mr. McMullen's childhood or mental health. However, he stated that, with respect to a test that ranked Mr. McMullen high in criminal thinking because of a need for power and control, "I would also observe that those factors also exist in a person who's been abused and/or neglected and there is reference [in the PSR] regarding a boyfriend who abused him, abused his mother, abused his sister. Uh, I think that, uh, those individuals that have issues of control in their lives are people who have been abused and/or neglected. And so, that need can also be looked at as a mitigator." DA Tr. 495–96. The State argued that Mr. McMullen had been a "menace to this community since he was ten years old. He has no social redeeming factors." *Id.* at 493. The State requested 50 years due to Mr. McMullen's lengthy criminal history and because this crime involved dealing a high quantity of drugs from an apartment with a gun while his baby was present. *Id.*

The Indiana Court of Appeals did not explicitly find that trial counsel's performance was reasonable. *See McMullen II*, 2018 WL 3131420 at *11 ("We initially *note* that [trial counsel] did argue several mitigating circumstances at McMullen's hearing …"). Accordingly, the Court reviews trial counsel's performance *de novo*. *Myers*, 2020 WL 5552196, at *7 (citing 28 U.S.C. § 2254(d) and noting that "[w]hen a state court reaches only one part of *Strickland*'s two-pronged analysis, we review the unaddressed prong *de novo*.").

The Supreme Court has made clear that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688). This includes the "duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to make reasonable investigations is present not only before and during trial, but also in preparation for sentencing. *See Pruitt v. Neal*, 788 F.3d 248, 271–73 (7th Cir. 2015). With respect to clients who suffer from a mental illness, when it is "apparent" to defense counsel "that the defendant has some mental or other condition that will repay further investigation . . . then the failure to investigate will be ineffective assistance." *Brown v. Sternes*, 304 F.3d 677, 692 (7th Cir. 2002). Trial counsel acknowledged that he did not conduct any investigation into Mr. McMullen's background despite understanding the importance of developing mitigation at sentencing. Certainly, there were red flags in the PSR that should have prompted trial counsel to delve into Mr. McMullen's background.

The evidence submitted at Mr. McMullen's post-conviction hearing was much more detailed and compelling than the generic references to abuse mentioned in Mr. McMullen's PSR. At the post-conviction hearing, post-conviction counsel submitted affidavits from family members, friends, and a therapist who treated Mr. McMullen as a child. *See generally* dkt. 7-9 (PCR Exhibits). Post-conviction counsel also submitted a psychological report generated at YOC when Mr. McMullen was 13 years old. Dkt. 7-9 at 127–35. Post-conviction counsel retained psychologist Robin Kohli who reviewed the same background materials provided to the court, conducted a variety of tests on Mr. McMullen, and synthesized her findings in a comprehensive report. Dkt. 7-9 at 64–81.

Mr. McMullen's childhood was, in his words, "complete chaos." PCR Tr. 43. His mother was addicted to cocaine and used drugs while she was pregnant with him. Dkt. 7-9 at 66. His father was not involved in his life, and Mr. McMullen was told that his father beat his mother while she was pregnant with him to induce a miscarriage. *Id.* Mr. McMullen's mother had boyfriends that

abused her in front of Mr. McMullen and his sister, including one, named Rodney, who burned her stomach with an iron and another who held a gun to her head in front of the children and asked them why he shouldn't kill their mother right then. *Id.* Rodney also abused Mr. McMullen, kicking, punching, and choking him and throwing him down the stairs. *Id.* When Rodney became particularly abusive, Mr. McMullen tried to call the police and have him arrested for domestic violence and supplying his mother with drugs, to no avail. *Id.* Mr. McMullen was afraid of the police as a child after they conducted several raids where they entered his residence using a battering ram and smoke bombs and held him and his family at gunpoint. *Id.* at 79. Mr. McMullen was eventually placed with his paternal grandmother, who was not physically abusive but did leave him alone on the weekends from the age of seven to eleven while she visited her boyfriend in another city. *Id.* at 67. His childhood trauma caused him to develop migraines at the age of six, and he first experienced suicidal ideation at seven. *Id.* at 22–23, 65. Mr. McMullen began selling drugs as a teenager at the urging of his mother's abusive boyfriend and because he wanted to financially support his mother. *Id.* at 24, 68. Despite his troubled childhood, Mr. McMullen was described as an active father who provided for his children financially and emotionally. *Id.* at 72. Based on his psychosocial history and psychological testing, Dr. Kohli diagnosed Mr. McMullen with panic disorder, posttraumatic stress disorder, substance use disorder, antisocial personality disorder, and possible depressive disorder. *Id.* at 78.

The Court finds that trial counsel's performance at Mr. McMullen's sentencing hearing was deficient. He conducted no independent investigation into Mr. McMullen's background despite red flags in his PSR. *See Porter v. McCollum*, 558 U.S. 30, 40 (2009). As a result, the sentencing court did not have before it a comprehensive view of Mr. McMullen's traumatic childhood and related

mental health issues, nor did it have evidence of his positive characteristics to combat the State's portrayal of him as a "menace" with "no social redeeming factors." DA Tr. 493.

With respect to the prejudice prong, the Indiana Court of Appeals determined that there was no reasonable probability the evidence uncovered during post-conviction relief proceedings would have changed the outcome of Mr. McMullen's sentence. The court correctly recognized that, when determining whether a defendant is prejudiced by trial counsel's failure to present mitigating evidence at sentencing, the court must examine the totality of the omitted mitigation evidence and compare it with what was presented at his sentencing hearing. *McMullen II*, 2018 WL 3131420 at *11 (citing *McCarty v. State*, 802 N.E.2d 959, 967 (Ind. Ct. App. 2004)); *see also Williams v. Taylor*, 529 U.S. 362, 397–98 (2000) (assessing prejudice at the sentencing phase of a capital trial, the court must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation."). The appellate court agreed with the trial court's reasoning that the state had expended resources to help rehabilitate Mr. McMullen, which had included "probation, placement at the Youth Opportunity Center, placement at George Junior, cognitive behavioral therapy, behavioral aftercare, POOL School, Family Services Homebased Program, alcohol and drug counseling, and intensive outpatient treatment, in addition to the intermediate punitive sanctions of license suspensions, detention, house arrest, and jail." *McMullen II*, 2018 WL 3131420 at *11. The trial court's decision to sentence Mr. McMullen to the maximum sentence was thus based on his extensive criminal history and his "increasingly troubling behavior" despite prior attempts to rehabilitate him. *Id.*  The Indiana Court of Appeals concluded,

> The additional mitigating evidence that McMullen argues could have been offered by his friends and family, *see* Appellant's Br. at 51–52, would not have favorably impacted his sentence. Moreover, that same evidence would have done nothing to

account for or explain the illegal possession of marijuana and cocaine for which McMullen was convicted.

*Id.*

Although the Indiana Court of Appeals identified the correct standard, it is not clear that it reasonably applied the standard to the facts. "A decision involves an unreasonable application of clearly established law if the state court 'identifies the correct governing legal principle ... but unreasonably applies that principle to the facts of the prisoner's case.'" *Simonson v. Hepp*, 549 F.3d 1101, 1106 (7th Cir. 2008) (quoting *Williams*, 529 U.S. at 405–06). The court stated, "[B]ecause of the presentence investigation report, the sentencing court was already well aware of McMullen's background and any mental health concerns." *Id.* With only a few references to abuse in the PSR, the sentencing court was *not* aware of the severe nature of Mr. McMullen's childhood trauma or the impact it had on his mental health and behavior. And the court referred only to additional mitigating evidence that would have been provided "by his family and friends." *Id.* The court omitted any mention of Dr. Kohli's comprehensive report or of the diagnoses she made based on her testing.[4] Thus, it is not obvious that the Indiana Court of Appeals actually compared the detailed mitigation evidence presented on post-conviction to the vague references to abuse in his PSR and the uninformed argument related to abuse and neglect made by counsel at his sentencing hearing.

But, as stated above, the issue this Court must decide "is not whether [it] agree[s] with the state court decision or even whether the state court decision was correct. The issue is whether the decision was unreasonably wrong under an objective standard." *Dassey*, 877 F.3d at 302. "Put another way, [the Court] ask[s] whether the state court decision 'was so lacking in justification that

---

[4] The postconviction court also failed to recognize Dr. Kohli's input, stating only that McMullen alleged that trial counsel "should have called a host of friends, family members, and his child therapist to bolster" the argument that his troubled childhood should have been considered mitigating. Dkt. 7-8 at 214.

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). The Court cannot say the decision was unreasonably wrong or lacking in justification. Mr. McMullen had a lengthy criminal history, and the details of his crime—dealing drugs from a family housing complex with his baby present—are disturbing. *See McMullen I*, 2011 WL 2507057, at *5–6 (upholding maximum sentence based on nature of offense and Mr. McMullen's extensive criminal history).

Accordingly, even though the Court finds Mr. McMullen's trial counsel performed deficiently at his sentencing hearing, the Court concludes that the state court's decision that he was not prejudiced was not an unreasonable application of federal law. Mr. McMullen is not entitled to relief on this basis.

### C. Ineffective Assistance of Appellate Counsel

"The general *Strickland* standard governs claims of ineffective assistance of appellate counsel as well as trial counsel." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015).

### i.    Motion to Suppress

Mr. McMullen alleges that his appellate counsel failed to effectively challenge the search and seizure evidence on appeal. First, he alleges that appellate counsel omitted several important facts in support of his argument that Mr. Gause was a government agent including: 1) the federal government owned Greentree; 2) Mr. Gause's employer had a contract to manage the apartment complex for the government; 3) Mr. Gause was required by the United States Department of Housing and Urban Development (HUD) to police the complex for crime and report to authorities; and 4) Mr. Gause had an informal relationship with Detective Sands. The Indiana Court of Appeals determined that counsel was not ineffective because on direct appeal, the court "had access to each piece of evidence that McMullen claims [appellate counsel] was ineffective for failing to bring to

21

21

this court's attention," and "found that 'the trial court reasonably concluded that Gause was not acting as an agent or instrument for the State when he entered the apartment to spray for pests.'" *McMullen II*, 2018 WL 3131420 at *13 (quoting *McMullen I*, 2011 WL 2507057, at *4).

This was a reasonable application of federal law. Mr. Gause entered the apartment as an escort to an exterminator who sprayed all the apartments at Greentree twice a year. Dkt. 7-2 at 50. He never entered apartments at Greentree at law enforcement's request. *Id.* at 60. Further, tenants were provided a newsletter that informed them of the upcoming pest treatments. DA Tr. 100. Accordingly, this case is distinguishable from *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), upon which Mr. McMullen relied. There, the Supreme Court held that a state hospital's performance of a drug test to obtain evidence of a pregnant patient's criminal drug use was an unreasonable search if the patient had not consented to the procedure. *Id.* at 86. Although the ultimate goal of the program was to get women access to substance abuse programs, "the immediate objective of the search was to generate evidence *for law enforcement purposes*," and the police and local prosecutors were heavily involved in the administration of the program. *Id.* at 82–83 (emphasis in original). Mr. Gause's entry into the apartment was not as a government agent collecting information for possible criminal prosecution but rather was as an apartment manager spraying for insects. Thus, there is no reasonable likelihood that highlighting the above factors about the relationship between HUD and the apartment complex manager—already available to the Indiana Court of Appeals in the record—would have changed the outcome of Mr. McMullen's appeal.

### ii.    Exclusion of Bias Evidence

Mr. McMullen alleges that his appellate counsel should have challenged the exclusion of evidence that witness Michelle Garrett had been charged with drug dealing. DA Tr. 279–81,

299−300. When the claim is poor issue selection, "appellate counsel's performance is deficient under *Strickland* only if [he] fails to argue an issue that is both 'obvious' and 'clearly stronger' than the issues actually raised." *Makiel*, 782 F.3d at 897.

At trial, Mr. McMullen wanted to elicit testimony that Ms. Garrett had been charged with drug dealing about three to four months after Mr. McMullen's arrest and had been offered a beneficial deal that depended on her successful completion of substance abuse counseling. DA Tr. 279–80, 299–300. The trial court excluded the evidence. DA Tr. 300. The Indiana Court of Appeals found that evidence about Ms. Garrett's drug charge and deal was properly excluded because the deal was "based on her participation in counseling and had nothing to do with her testimony in McMullen's case." *McMullen II*, 2018 WL 3131420 at *14. Further, Ms. Garrett was a known drug user at the time of Mr. McMullen's arrest and had given a statement to the police before she was ever arrested. *Id.* At trial, Ms. Garrett admitted to trying to buy cocaine from Mr. McMullen, an admission that the Indiana Court of Appeals found further diminished any accusation of bias. *Id.* Accordingly, the Indiana Court of Appeals found that appellate counsel did not perform deficiently by failing to challenge the exclusion of admissible evidence. *Id.* "Counsel is not ineffective for failing to raise meritless claims." *Waren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013) (internal citations omitted). The Indiana Court of Appeals reasonably concluded that appellate counsel was not ineffective for failing to raise a meritless claim.

### IV.
### Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Instead, a state prisoner must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing

of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In deciding whether a certificate of appealability should issue, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck*, 137 S. Ct. at 773 (citation and quotation marks omitted).

Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." The Indiana Court of Appeals reasonably applied federal law when it analyzed each of Mr. McMullen's ineffective assistance of trial and appellate counsel claims. However, because jurists of reason could disagree with the Court's resolution of Mr. McMullen's ineffective assistance of counsel at sentencing claim, and because the issue deserves encouragement to proceed, a certificate of appealability is **granted** as to that claim.

**V.**
**Conclusion**

Mr. McMullen's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **denied**. A certificate of appealability shall issue as to his ineffective assistance of trial counsel at sentencing claim.

Final Judgment in accordance with this decision shall issue.

**IT IS SO ORDERED.**

Date:   10/23/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

24

24

Distribution:

RYAN T. MCMULLEN
199066
WABASH VALLEY – CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

Jesse R. Drum
INDIANA ATTORNEY GENERAL
jesse.drum@atg.in.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

RYAN T. MCMULLEN,                    )
                                     )
                Petitioner,          )
                                     )
          v.                         )          No. 2:19-cv-00356-JRS-MJD
                                     )
RICHARD BROWN Warden,                )
                                     )
                Respondent.          )

## FINAL JUDGMENT

The Court now enters final judgment. The petitioner's petition for a writ of habeas corpus

is denied, and the action is dismissed with prejudice.

Date: 10/23/2020

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

RYAN T. MCMULLEN
199066
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

Jesse R. Drum
INDIANA ATTORNEY GENERAL
jesse.drum@atg.in.gov

<u>Certificate of Service</u>

I certify that on the date listed below, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: September 19, 2022.

By    s/    *Benjamin S. Morrell*
        Benjamin S. Morrell
        Taft Stettinius & Hollister LLP
        111 E. Wacker Dr.
        Suite 2800
        Chicago, IL 60601
        (312) 527-4000
        bmorrell@taftlaw.com

        *Pro Bono Counsel for Petitioner-Appellant*